IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO  DIVISION

| | | |
|---|---|---|
| LAURA DUTTON | § | |
| | § | |
| Plaintiff | § | CIVIL ACTION NO.  2:13-CV-180 |
| | § | |
| V | § | JUDGE ROBINSON |
| | § | |
| JAYSON FRY, former City of Estelline | § | |
| police officer, in his individual and official | § | |
| capacities; | § | |
| CHRIS JOLLY, City of Memphis police | § | |
| chief, in his individual and official | § | |
| capacities; | § | |
| CITY OF ESTELLINE, TEXAS | § | |
| | § | |
| Defendants | § | |

**PLAINTIFF'S BRIEF IN SUPPORT OF RESPONSE IN OPPOSITION
TO DEFENDANT CITY OF ESTELLINE'S MOTION FOR SUMMARY JUDGMENT[1]**

NOW COMES, Plaintiff, through undersigned counsel, and respectfully files this brief in support of her response in opposition to Defendant City of Estelline's Motion for Summary Judgment and would respectfully show the Court the following:

---

[1]By May 4, 2014 Notice, Defendants have additionally re-urged their October 15, 2013 Motion to Dismiss.  For the reasons contained herein, as well as in Plaintiff's original response, Defendants' Motion to Dismiss should be denied.

<u>Table Of Contents</u>

<u>Page</u>

Table of Contents.............................................................................................................ii

Table of Authorities........................................................................................................iii

I.      Summary................................................................................................................1

II.     Issues.....................................................................................................................2

III.    Appendix Evidence Relied Upon..........................................................................3

IV.     Plaintiff's Statement of Relevant Facts................................................................4

V.      Standard for Summary Judgment........................................................................26

VI.     Defendant City of Estelline is Not Entitled to Summary Judgment on
        Plaintiff Dutton's Fourth Amendment Claims.....................................................27

VII.    Defendant City of Estelline's Motion for Summary Judgment on Plaintiff Dutton's
        State Law Claims Should be Denied as Moot......................................................38

VIII.   Miscellaneous Issues Regarding Plaintiff's Damages.........................................39

IX.     Conclusion...........................................................................................................40

**TABLE OF AUTHORITIES**

<u>**Cases**</u>                                                                                                    <u>**Page**</u>

<u>$9050 in U.S. Currency v. State</u>, 874 S.W.2d 158, 161 (Tex.App.-Houston 1994)......................35

<u>Beck v. Ohio</u>, 379 U.S. 89, 91 (1964)............................................................................................32

<u>Bennett v. City of Slidell</u>, 735 F.2d 861, 862 (5th Cir. 1984) (*en banc*),
*cert. denied*, 472 U.S. 1016 (1985)..............................................................................................36

<u>Brandon v. Holt</u>, 469 U.S. 464, 467 (1985)...................................................................................37

<u>Canton v. Harris</u>, 489 U.S. 378, 387 (1989).................................................................................37

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)......................................................................26

<u>Deschenes v. State of Texas</u>, 253 S.W.3d 374 (Tex.App.–Amarillo, 2008)..................................35

<u>Doe v. Dallas Independent School District</u>, 153 F.3d 211, 216 (5th Cir. 1998)............................37

<u>Doe v. Rains County ISD</u>, 66 F.3d 1402, 1409 (5th Cir. 1995)......................................................37

<u>Douthit v. Jones</u>, 641 F.2d 345, 346 (5th Cir. 1981).....................................................................37

<u>Dyke v. Taylor Implement Mfg. Co.</u>, 391 U.S. 216, 221 (1968)....................................................30

<u>Familias Unidas v. Briscoe</u>, 619 F.2d 391, 404 (5th Cir. 1980)....................................................38

<u>Florida v. Harris</u>, 133 S.Ct. 1050, 1057-58 (2013).......................................................................31

<u>Florida v. White</u>, 526 U.S. 559, 564-65 (1999).............................................................................35

<u>Freeman v. Florida</u>, 70 U.S. 811, 815 (1985)...............................................................................32

<u>Gardner v. Bd. of Police Commr's for Kansas City, Mo.</u>, 2012 WL 170969 at * 3
(W.D.Mo. Jan. 20, 2012)...............................................................................................................29

<u>Granado v. State of Texas</u>, 2006 WL 2466972 (Tex.App.–Amarillo, Aug. 25, 2006)..................34

<u>Harper v. Harris County</u>, 21 F.3d 597, 600 (5th Cir. 1994)..........................................................26

<u>Kersh v. Derozier</u>, 851 F.2d 1509, 1513 n. 6 (5th Cir. 1988)........................................................37

King v. State of Texas, 254 S.W.3d 579 (Tex.App.–Amarillo, 2008)............................................35

Kingsland v. City of Miami, 382 F.3d 1220 (11th Cir. 2004)...........................................29

Lozano v. Smith, 718 F.2d 756, 768-71 (5th Cir. 1983)...................................................37

McClelland v. Facteau, 610 F.2d 693, 697 (10th Cir. 1979)...........................................37

Monell v. New York Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)............................................................................36

Rowe v. City of Fort Lauderdale, 279 F.3d 1271, 1279 n. 9 (11th Cir. 2002).................................29

Santiago, 310 F.3d at 342.........................................................................................28

Turner v. Upton County, Texas, 915 F.2d 133 (5th Cir. 1990)............................................38

U.S. v. $10,700 in U.S. Currency, 258 F.3d 215, 229-31 (3d Cir. 2001).......................................31

U.S. v. U.S. Currency $30,060.00, 39 F.3d 1039, 1042 (9th Cir. 1994).......................................31

U.S. v. $80,760 in U.S. Currency, 781 F.Supp.462, 475-78 (N.D.Tex. 1991)..............................31

U.S. v. $506,231 in U.S. Currency, 125 F.3d 442, 453 (7th Cir. 1997).......................................31

U.S. v. Brigham, 382 F.3d 500, 507 (5th Cir. 2004)..........................................................27

U.S. v. Cavitt, 550 F.3d 430, 437 (5th Cir. 2008)............................................................28

U.S. v. Corral-Franco, 848 F.2d 536, 540-41 (5th Cir. 1988)................................................32

U.S. v. Daniels, 2009 WL 1565873 at *5 (E.D.La. 2009)......................................................31

U.S. v. Dortch........................................................................................................28

U.S. v. Estrada, 459 F.3d 627, 632 (5th Cir. 2006).........................................................28

U.S. v. Jones, 234 F.3d at 234..............................................................................27, 28

U.S. v. Macias, 658 F.3d 509, 517-18 (5th Cir. 2011)......................................................27

U.S. v. Shabazz, 993 F.2d at 435.............................................................................27

iv

U.S. v. Sokolow, 490 U.S. 1, 7 (1989)...........................................................................27

Vineyard v. Murray County, 990 F.2d 1207, 1212 (11th Cir.), *cert. denied*, 510 U.S. 1024 (1993)....37

**Authorities**                                                                    **Page**

Fourth Amendment..............................................................................................27, 32, 35

Freedom of Information Act.......................................................................................17

*Texas Penal Code*...................................................................................................23

*Tex. Code Crim. Pro.*.............................................................................................35

# I

## Summary

This is a police misconduct case in which Plaintiff Dutton contends that she was subjected to an unlawful detention, arrest, search and seizure by Defendants Estelline Police Officer Jayson Fry and Memphis Police Chief Jolly as a result of Defendant City of Estelline's policy of financing its city operations almost entirely through fines and forfeitures obtained by its single officer who otherwise is provided little to no training or supervision beyond the directive to go out and "make me some money."

In the present case, such directive resulted in the detention, arrest and incarceration of Plaintiff Dutton for money laundering, search of her vehicle, and seizure of $31,000.00, despite the facts that:  (1) Plaintiff Dutton violated no law other than speeding (61 mph in a 50 mph zone); (2) no evidence of criminal activity, *e.g.* drugs were found; and (3) Plaintiff's sisters telephonically confirmed to the defendant officers at the scene that Plaintiff Dutton had obtained the money from a property sale which occurred a few weeks prior.  The defendant officers were even advised by District Attorney investigator Danny Dawson, who Defendant Chief Jolly considers to be an expert, that if it were his case he would not arrest Plaintiff Dutton.

Defendants nevertheless contend that probable cause existed for their actions  based upon (1) hotly contested assertions that Plaintiff Dutton was nervous, made furtive movements, gave evasive answers, that the vehicle and/or money smelled like marijuana; and that no one could corroborate Plaintiff Dutton's story as to how the money was obtained; (2) misleading statements about the officers' agreement that probable cause existed and the advice provided by the District Attorney's office; (3) flat out misrepresentations about what bank tellers and Chief Jolly indicated

1

they smelled on the money; and (4) the expert report of Commander Albert Rodriguez – who relies on the disputed evidence in reaching his conclusions.

In short, this case is replete with disputed issues of material fact regarding whether a reasonable officer in the individual defendants' positions could have believed that reasonable suspicion and/or probable cause existed to detain, search and/or arrest Plaintiff Dutton, or seize her assets.  Summary judgment should in all things be denied.

## II

## <u>Issues</u>

1.   Whether Defendant Officer Fry had reasonable suspicion to detain Plaintiff Dutton, despite the substantial evidence that Defendant Fry's allegations of furtive movements, nervousness, and the alleged smell of marijuana, are all hotly disputed issues of material fact.

2.   Whether Defendant Officer Fry had probable cause to search Plaintiff Dutton's vehicle, despite the substantial evidence that no smell of marijuana existed and the drug dog was unreliable and was merely responding to currency, both of which are the factors which Defendant Officer Fry claims provided him probable cause to search.

3.   Whether Defendant Officer Fry had probable cause to arrest Plaintiff Dutton, despite the substantial evidence that no probable cause existed to believe that there was a connection between Plaintiff's money and any criminal activity.

4.   Whether Defendant Officer Fry had probable cause to seize Plaintiff Dutton's money, despite the substantial evidence that no probable cause existed to believe that there was a connection between the money and any criminal activity.

5.   Whether Defendant City of Estelline is liable for Defendant Officer Fry's unlawful actions given the substantial evidence that Defendant Fry was provided little to no training or supervision apart from the directive to go make the City some money.

6.   Whether Plaintiff Dutton is entitled to pursue damages for her money that was not returned and her bond fees, given the substantial evidence that Plaintiff Dutton has suffered such monetary losses.

2

**III**

**Appendix Evidence Relied Upon**

Exhibit 1  Affidavit of Laura Dutton (with attachment)

     Exhibit A  Response to Plaintiff Dutton's Freedom of Information Act request to the 100th Judicial District Attorney, including:

          1.  Hall County Sheriff Department Booking Information

          2.  Estelline Police Department Offense Report

          3.  Van Zandt Abstract and Title Correspondence

          4.  Complaint and Affidavit

          5.  Magistrate Warning

          6.  Affordable Bail Bond Document

          7.  Rejection Letter to Estelline Police Department

Exhibit 2  Deposition of Laura Dutton [excerpts]

Exhibit 3  Deposition of Jayson Fry [excerpts]

Exhibit 4  Deposition of Christopher Jolly [excerpts]

Exhibit 5  Deposition of Danny Dawson [excerpts]

Exhibit 6  Deposition of Richard Ferguson [excerpts]

Exhibit 7  Deposition of Nelwyn Ward [excerpts]

Exhibit 8  Deposition of Vicki Knowles [excerpts]

Exhibit 9  Deposition of Colleen Owens [excerpts]

Exhibit 10  Affidavit of Virgie Weaver

Exhibit 11  Affidavit of Nancy Randolph Hutchins

Exhibit 12        Affidavit of Mike Lammerding

Exhibit 13        Affidavit of Jacqueline Pipla

Exhibit 14        Affidavit of Frank M. English, III

Exhibit 15        City of Estelline, Texas Statement of Revenues, Expenditures, and Changes in Fund
                  Balance Governmental Funds for the Year Ended September 30, 2012 with
                  Comparative Totals for Year Ended September 30, 2011

Exhibit 16        Standard Operation Procedures Police Department

Exhibit 17        Service History for Jayson Fry

Exhibit 18        Affidavit of Colleen Owens

Exhibit 19        Affidavit of Vicki Knowles

## IV

## Plaintiffs' Statement of Relevant Facts

**A.      The Municipalities**

1.      City of Estelline

The City of Estelline, Texas has approximately 150 to 200 people. [App. P. 97, ln. 22-24]. It has two liquor stores, a trucking company and a cotton gin. [App. P. 215, ln. 18-21]. The City of Estelline would not have any substantial income without traffic fines and seizures. [App. P. 214, ln. 1-3]. In fact, the City Council would be unable to properly maintain the town at all without fines and seizures. [App. P. 214, ln. 4-7]. At best, they would be able to afford one person for a city staff. [App. P. 214, ln. 8-10]. Specifically, for example, in fiscal year 2012, Defendant City of Estelline had a total revenue of $430,676 of which $387,339 came from fines and forfeitures. [App. P. 210, ln. 2-13; App. P. 237].

4

City Administrator Ferguson notes that the vast majority of the Council Members for Defendant City of Estelline believe that without this money, Estelline would be like other towns in the area that have just gone away. [App. P. 204, ln. 20 through p. 205, ln. 8]. As a result, Mayor Pro Tem Manley has commented about the need for the City to be able to increase its revenue a bit every year. [App. P. 203, ln. 8-19]. Council Members have also stated that without traffic stop revenue, there would be no police department for the City of Estelline. [App. P. 100, ln. 19-22].

Defendant City of Estelline also has been audited by the state for not paying approximately $600,000.00 in required quarterly payments over a period of a couple of years. [App. P. 212, ln. 19 through p. 213, ln. 18]. Approximately $300,000 of that delinquency remains for which the city makes payments of $10,000.00 per month. [App. P. 214, ln. 14-18].

As a result, traffic stops are very important to the revenue of Defendant City of Estelline. [App. P. 100, ln. 15-18]. The average citation issued by the City of Estelline is $190. [App. P. 211, ln. 10-21]. Defendant Officer Fry pulled over up to 35 people per day. [App. P. 99, ln. 9-13]. The vast majority of his time was spent in traffic enforcement. [App. P. 98, ln. 25 through p. 99, ln. 2]. Former Estelline Officer Frank English notes that he was specifically told that his primary purpose was traffic enforcement on U.S. Highway 287. [App. P. 235. ¶ 2]. He also recalls having lunch with Council Member Ivey and Chris Jolly and being told to get back on the highway and "make [Council Member Ivey] some money." [App. P. 236. ¶ 4].

Asset forfeitures, in particular, serve as an avenue for the City to have the ability to purchase additional equipment. [App. P. 101, ln. 17-20; App. P. 206, ln. 4-23].

Estelline's City Council serves as the overall supervisors for officers of the City of Estelline. [App. P. 196, ln. 18-23]. However, there is no official day to day supervision over City of Estelline

5

officers beyond approving schedules and scheduling leave. [App. P. 196, ln. 21 through p. 197, ln. 2]. What the officers do in the course and scope of their employment is left to their discretion. [App. P. 197, ln. 3-6]. Former Officer English notes that to the extent that the City of Estelline had anyone supervise <u>him</u>, it was Defendant Chief Jolly, then a patrol officer for the City of Memphis. [App. P. 236. ¶ 3].

The only written policies and procedures for the City of Estelline Police Department are the very general "Standard Operation Procedures" provided to Officer Fry which have little to do with actual performance as an officer. [App. P. 200, ln. 2 through p. 201, ln. 3]. With regard to activities concerning arrest, search and/or seizure, the City of Estelline has no written policies whatsoever. [App. P. 201, ln. 4-7]. There are also no policies regarding the use of a drug dog or when it is appropriate to seize assets. [App. P. 202, ln. 4-23]. These matters are left to the subjective discretion of the officers. [App. P. 202, ln. 8-11; p. 202, ln. 24 through p. 203, ln. 1].

Chief Administrator Ferguson adds that while the City of Estelline has had no "official" complaints during the past five years, they have received dozens and dozens of telephone complaints over the past three and a half years. [App. P. 207, ln. 17 through p. 208, ln. 4]. Unless the complaint is put in writing, no record is kept by the City of Estelline. [App. P. 209, ln. 6-8].

It is against this backdrop in which the traffic patrol officer for the City of Estelline is expected to provide the revenue for the City of Estelline's operations, including his own salary, that Defendant Jayson Fry, an itinerant law enforcement officer whose service history shows 23 separate

positions over a 15 year career [App. P. 94, ln. 20-25; App. P. 240], stopped, detained, and arrested Plaintiff Dutton, while seizing her money.[2]

Defendant Officer Fry admits that he is the person who made the decision to arrest Laura Dutton on November 28, 2012. [App. P. 96, ln. 9-11]. He is also the person who determined that her vehicle should be subjected to a drug dog search, that her vehicle should be physically searched, and that her funds should be seized. [App. P. 96, ln. 12-23]. He made each of these decisions in his capacity as a City of Estelline police officer. [App. P. 96, ln. 24 through p.97, ln. 1]. To his knowledge, all of his actions were in compliance with the policies, procedures, practices and customs of the City of Estelline. [App. P. 97, ln. 2-6]. Of course, as the sole police officer with the City of Estelline Police Department, he was the person responsible for maintaining the customs and practices of the City of Estelline Police Department. [App. P. 97, ln. 7-12]. He was never subjected to any discipline over his conduct on November 28, 2012. [App. P. 97, ln. 24 through p. 98, ln. 2]. In fact, there was never even any investigation by the City of Estelline regarding his conduct on November 28, 2012. [App. P. 97, ln. 20-23].

2.     City of Memphis

Defendant Chief Jolly is responsible for the City of Memphis' police policies during his tenure. [App. P. 169, ln. 13-15]. The Memphis City Council thereafter approves his policy. [App. P. 169, ln. 22 through p. 170, ln. 12]. He sets the general customs and informal practices of the City of Memphis Police Department based off of that policy. [App. P. 1703, ln. 13-19]. Defendant Chief

_____

[2]By Defendant Officer Fry's own estimation, the only location that he worked as a law enforcement officer for more than 2 years was Ranger from 2001 to 2004. [App. P. 94, ln. 20-25]. He worked at the City of Estelline from only October, 2012 through December, 2012. [App. P. 92, ln. 23 through p. 93, ln. 5].

7

Jolly also drafted the Memphis Police Department canine policy. [App. P. 172, ln. 21-25]. Defendant Chief Jolly was not disciplined in any way over his role in the November 28, 2012 incident. [App. P. 170, ln. 25 through p. 171, ln. 2; App. P. 218, ln. 16 through p. 219, ln. 5].

Defendant Chief Jolly acknowledges that the City of Memphis would receive a percentage of forfeiture money where Memphis officers, such as himself, assisted. [App. P. 182, ln. 19 through p. 183, ln. 1].

### B.   Plaintiff Dutton

Plaintiff Dutton is a 64 year old, law abiding citizen. Prior to November 28, 2012, she had never been arrested for anything in her entire life. In fact, during the early 1990s, she worked as a jailor for the Tarrant County Sheriff's Department for approximately 4 or 5 years. [App. P. 1. ¶ 2; App. P. 33, ln. 9-14].

During the late 1990s, Plaintiff Dutton became somewhat ill. She eventually healed herself using natural health products. [App. P. 1. ¶ 3; App. P. 35, ln. 11-22]. As a result, she tries not to put unhealthy chemicals into her body, but uses primarily healthy, organic products, food, and drink. She certainly does not drink alcohol, smoke or do drugs. [App. P. 1. ¶ 3].

In October, 2012, Plaintiff Dutton was a party to the sale of 12.9 acres of land in Van Zandt County, Texas. [App. P. 34, ln. 5-24]. After the sale of the land closed, she cashed her proceeds in the amount of $34,997 at the bank in Canton, Texas on October 17, 2012. [App. P. 79, ln. 3-24]. She kept the money at her home until she decided to take a trip to Amarillo in November, 2012, when she took it with her. [App. pp. 1-2, ¶ 4; App. P. 79, ln. 25 through p. 80, ln. 3].

In November, 2012, Plaintiff Dutton traveled to Amarillo, Texas in order to meet up with a friend that she had met on the internet, named Michael Lammerding. They had collaborated on some

music and generally hit it off.    They stayed at the Holiday Inn Express in Amarillo for six or seven days.  This was the first time they had met in person, and while they had hit it off over the internet, Plaintiff Dutton did not want him to come to her home area the first time he visited.  She looked at it as a little vacation. [App. P. 2 ¶ 5; App. P. 41, ln. 9 through p. 44, ln. 12].

At the conclusion of the visit on November 28, 2012, Plaintiff Dutton took Mr. Lammerding to the Amarillo Airport for him to fly home, then started driving back to her own home in Azle, Texas. [App. P. 2 ¶ 6; App. P. 45, ln. 14-20].

On her way back to Azle, Plaintiff Dutton was stopped by Defendant Fry in the City of Estelline, Texas –which she has since learned is  a well known speed trap. [App. P. 2 ¶ 7]. Defendant Officer Fry operated the speed trap in Defendant City of Estelline at the time.

**C.      The Incident**

On the evening of November 28, 2012, Plaintiff Dutton was driving on U.S. Highway 287 South.  As she was coming into Estelline, she saw a police car, which she later found out contained Officer Fry, facing northbound on the southbound shoulder, just after the speed limit dropped to 50 mph. [App. P. 2 ¶ 8; App. P. 46, ln. 12 through p. 47, ln. 12].  She did not decrease her speed quickly enough, and she was stopped by Defendant Officer Fry for speeding. [App. P. 2 ¶ 8; App. P. 47, ln. 13-21].

Defendant Officer Fry pulled Plaintiff Dutton over just before dusk at about 6:55 p.m. [App. P. 104, ln. 12-15].  It was chilly and breezy with decent gusts of wind. [App. P. 103, ln. 21 through p. 104, ln. 4].  Defendant Officer Fry stopped Plaintiff Dutton for speeding, contending that she was going 61 mph in a 50 mph zone. [App. P. 106, ln. 3-7].

9

Officer Fry parked right behind Plaintiff Dutton. [App. P. 48, ln. 24 through p. 49, ln. 5]. After walking to Plaintiff Dutton's vehicle, he told her that she was speeding and asked for her driver's license and insurance. [App. P. 53, ln. 16-19].  He said he would be right back and eventually came back with a speeding ticket. [App. P. 2 ¶ 9; App. P. 53, ln. 20 through p. 54, ln. 1]. However, after returning, he did not just give Plaintiff Dutton a speeding ticket and let her go. Instead, he stood there sniffing.  Plaintiff Dutton did not know what he was sniffing at, and told him maybe he smelled her raw milk.  He claimed that he smelled marijuana. [App. P. 55, ln. 1-13].  This did not make any sense.  Plaintiff Dutton did not have any marijuana, had not smoked any marijuana, and had nothing in her vehicle which could have smelled of marijuana.  **Plaintiff Dutton is certain that neither her person, her truck nor anything in her truck (including her money) smelled like marijuana.[3]** [App. P. 3 ¶ 9; App. P. 88, ln. 19-22].  Furthermore, Plaintiff Dutton informed Defendant Officer Fry that his statement was not true as she did not drink, smoke or do drugs. [App. P. 3 ¶ 9; App. P. 55, ln. 14-21].[4]

Officer Fry asked Plaintiff Dutton if she minded if he searched her vehicle.  She said "yes." [App. P. 56, ln. 7-13].  When he asked why, Plaintiff Dutton accurately informed him that it was because she had done nothing wrong; other than speeding, she had broken no law. [App. P. 3 ¶ 10; App. P. 56, ln. 14-19].

---

[3]Plaintiff Dutton smoked marijuana once <u>many</u> years ago and has otherwise been in the presence of people smoking marijuana, so she is aware of what it smells like.

[4]Defendant Officer Fry acknowledges that Plaintiff Dutton told him there was no way he smelled marijuana coming from the vehicle as she had never had marijuana in the vehicle. [App. P. 114, ln. 5-7].

10

Officer Fry walked away from Plaintiff Dutton's vehicle and said that he would be right back. When he came back, he said that somebody would be coming with a dog. He told Plaintiff Dutton to stay off her cell phone and keep her windows up. [App. P. 3 ¶ 11; App. P. 56, ln. 20 through p. 57, ln. 9].

As Plaintiff Dutton was not under arrest at the time, she called her sister Virgie Weaver to let her know where she was. [App. P. 57, ln. 10-14]. Ms. Weaver told Plaintiff Dutton to calm down; that it was no big deal. However, Plaintiff Dutton informed her that she was concerned because the officer had mentioned marijuana. Plaintiff Dutton asked her sister to stay by her phone. [App. P. 3 ¶ 12; App. P. 57, ln. 20 through p. 58, ln. 8]. Plaintiff Dutton also cracked her window because she wanted to hear what the officer was saying. [App. P. 59, ln. 3-22].

After several minutes, an officer who Plaintiff Dutton later learned to be Memphis Police Chief Jolly came to the scene with his drug dog. Plaintiff Dutton was moved outside of her vehicle. [App. P. 60, ln. 7-16]. As he went around the vehicle with the dog, outside of Plaintiff's view, Chief Jolly stated: "hit, detain her." [App. P. 36, ln. 22 through p. 37, ln. 6; App. P. 38, ln. 4-5; App. P. 60, ln. 21 through p. 61, ln. 1]. It is impossible for an accurate hit to have taken place as there were no drugs anywhere near Plaintiff's vehicle. Of course, they ultimately found no drugs in her vehicle. [App. P. 3 ¶ 13].

The officer behind Plaintiff Dutton, who she believed to be Officer Fry, handcuffed her and put her in his police car. [App. P. 4 ¶ 14; App. P. 61, ln. 2-4; p. 62, ln. 19 through p. 64, ln. 9].

Defendant Officer Fry, Defendant Memphis Chief Jolly and a female officer, who Plaintiff Dutton later learned to be Memphis Officer Deena Jolly,[5] proceeded to search Plaintiff's vehicle,

_____

[5][*See* App. P. 39, ln 5 through p. 40, ln. 1].

11

tossing everything out and stepping over her belongings. [App. P. 65, ln. 5-25].  Plaintiff Dutton

could see the three of them search her vehicle as the doors to her truck were open, and the interior

lights were on.   One of the officers found Plaintiff's purse in the center console and approximately

$31,000.00 wrapped up in bankers' wrappers.   The money was contained in two envelopes, inside

a plastic bag which was stuck in the top of Plaintiff's purse. [App. P. 77, ln. 3 through p. 78, ln. 5].[6]

After they found the money, all searching of the truck ceased.  The officers did not even keep

looking for marijuana or any other drugs.  In fact, Plaintiff was never patted down or physically

searched in any way.   Of course, there were no drugs in her truck or on her person to be found.

[App. P. 4 ¶ 15].

**All agree that no marijuana or any other drug was ever found.** [App. P. 114, ln. 8-10;

App. P. 115, ln. 1-3].

Chief Jolly came up to Plaintiff Dutton with the bag of money and asked if it was hers.  He

asked where she got it, and she told him it was from a land sale.  When he asked where, she told him

it was from Edom, Van Zandt County.  He asked if Plaintiff Dutton had the papers for it, and she

said yes.  However, she was not carrying them with her because she had no reason to.  He asked if

anyone could get them.  She said no as the doors of her house were locked, and she was the only one

with a key.  The officers then talked amongst themselves. [App. P. 4 ¶ 16; App. P. 68, ln. 12 through

p. 69, ln. 13].

_____

[6]Defendant Chief Jolly denies that he participated in the search of Plaintiff Dutton's
vehicle.  [App. P. 1444, ln. 2-4].  He does admit that his wife, Deena Jolly, did aid in the search
of Plaintiff Dutton's vehicle. [App. P. 144, ln. 7-9].  He also understands that Ms. Jolly ceased
searching after she located money in the vehicle. [App. P. 145, ln. 11-14].  Defendant Jolly also
agrees that a citizen carrying money does not make it contraband. [App. P. 146, ln. 5-7].

Plaintiff Dutton was moved to Chief Jolly's vehicle because he had a video camera with which he could record the interview. [App. P. 50, ln. 23 through p. 51, ln. 2; App. P. 69, ln. 14-24]. Unfortunately, he later allowed the video to be destroyed.   Chief Jolly read Plaintiff Dutton her rights. [App. P. 70, ln. 24 through p. 71, ln. 11].   He then  asked her where she got the money.  She truthfully told him that it was the result of a real estate transaction.  She told him who she sold the land to.  Although she had the papers regarding the sale at home, she was not carrying them with her, as she had no reason to.  Chief Jolly got out three to four times to talk to the other Officers.  Officer Fry once got in and asked why Plaintiff Dutton had not allowed him to search the vehicle.  She truthfully told him that it was because she had done nothing wrong. [App. P. 5 ¶ 17; App. P. 71, ln. 23 through p. 72, ln. 12].  Otherwise, Chief Jolly continued to ask the same questions over and over. [App. P. 73, ln. 24 through p. 74, ln. 8].

Defendant Chief Jolly agrees that he interviewed Plaintiff Dutton about her trip, and she explained why she had come from Azle to Amarillo and was returning home. [App. P. 157, ln. 1 through p. 159, ln. 17].  She also described to him how she obtained the money in her vehicle and the people who could verify it. [App. P. 159,  ln. 18 through p. 160, ln. 15].

Plaintiff's sister, Nancy Hutchins, who lives with sister Virgie Weaver, called Plaintiff's cell phone back just after 8:00 p.m. since they had not heard back from Plaintiff Dutton. [App. P. 66, ln. 6 through p. 67, ln. 16].[7]  Plaintiff Dutton could hear Chief Jolly's end of the conversation.  He told Ms. Hutchins that Plaintiff Dutton was right there.  Plaintiff Dutton could also hear him ask questions about the land sale. [App. P. 5 ¶ 18; App. P. 74, ln. 10 through p. 75, ln. 14].  It is

---

[7]Despite Chief Jolly's testimony to the contrary, Defendant Chief Jolly never initiated a call to Plaintiff's sisters in Plaintiff's presence. [App. P. 76, ln. 8-18].

13

Plaintiff's understanding that both of her sisters confirmed the sale of the land, although they did not know the exact date or amount of the sale.

Plaintiff's sister Virgie Weaver testifies that she spoke to Defendant Chief Jolly and confirmed that a land sale had taken placed in the last month or so, but she did not know the exact date or the amount of the transaction. [App. P. 228 ¶ 4]. Plaintiff's sister Nancy Hutchins, however, was able to tell him that while she did not know the exact amount, it would have been about $40,000.00. [App. P. 230 ¶ 4]. [8]

Chief Jolly also made other calls. Plaintiff Dutton now knows that one of the people he spoke to was District Attorney's office investigator Danny Dawson. Chief Jolly also told Plaintiff Dutton that if it was up to him, he would let her go, but that it was not up to him, it was up to Officer Fry. [App. P. 5 ¶ 18].

Officer Fry counted the money on the hood of the car. [App. P. 5 ¶ 19]. Later, at the jail, he came to Plaintiff Dutton's cell and told her that he counted $31,000.00 and that he would put it in the DA's account. [App. P. 81, ln. 20 through p. 82, ln. 7; App. P. 84, ln. 12 through p. 85, ln. 3]. Plaintiff Dutton was never given a receipt for her money or any official count. [App. P. 83, ln. 15-24]. However, the $31,000.00 amount sounded accurate, as she had left Azle with approximately $31,500.00 and had not spent very much money as Mr. Lammerding and she had both been sick during much of their stay and he paid for many of the things they did. [App. P. 5 ¶ 19].

---

[8]Defendant Chief Jolly does admit that he spoke to Plaintiff Dutton's sister. [App. P. 155, ln. 21-25]. He contends that Plaintiff Dutton's sister was able to confirm that there had been a property sale within the last two or three months. [App. P. 156, ln. 6-8]. She just did not know the exact amount. [App. P. 156, ln. 14-15].

Defendant Officer Fry, with the aid of Defendant Memphis Chief Jolly, arrested Plaintiff for money laundering, despite the fact that she had violated no law except speeding, and was lawfully carrying her own money.   Chief Jolly specifically came and sat down beside her and said they were going to arrest her. [App. P. 5 ¶ 20].

City of Estelline Administrator Richard Ferguson also came to the scene.  Plaintiff's truck battery died during the period of time that the officers were searching it.   City Administrator Ferguson helped jump start Plaintiff's truck. [App. P. 40, ln. 10-21].   It was then taken to the City of Estelline garage. [App. P. 6 ¶ 21].

**D.     The Aftermath**

Plaintiff Dutton was forced to spend the night in jail before she was able to bond out.  She had a bond fee of $1,050.00 which was paid by a friend.  She has agreed to pay back the bond fee. [App. P. 6 ¶ 22; App. P. 89, ln. 15 through p. 90, ln. 7].   She was not given her money back at the time of her release. [App. P. 6 ¶ 22].

Although Defendant Officer Fry fails to acknowledge same, Defendant Chief Jolly then recalls that upon reaching the jail, Defendant Officer Fry had his picture taken with the money fanned out on the desk, and Kilo, the drug dog laying in front of it. [App. P. 165, ln. 14 through p. 166, ln. 5].

Defendant Officer Fry does not recall giving Plaintiff Dutton any receipt for the money seized from her vehicle and admits that it is not notated on her booking property report. [App. P. 132, ln. 4-22; App. P. 133, ln. 13-18].   Defendant Officer Fry contends only that the money was counted and secured in his vehicle.  [App. P. 133, ln. 5-8].  He then put the money in an evidence bag and put it in a lockbox in the trailer where he lived as an Estelline police officer. [App. P. 133, ln. 19 through

15

p. 134, ln. 9]. He specifically did **not** place the money in the police department's evidence locker. [App. P. 134, ln. 20-22]. The next morning he left the money with Chief Administrator Ferguson while he performed some other tasks. [App. P. 135, ln. 4-10].

After Plaintiff Dutton returned to Azle, she overnighted records of her land transaction to the District Attorney's office and the City of Estelline on November 29, 2012. When she contacted the District Attorney's office, however, they did not have any knowledge of the charges, possession of the report, or any other information. [App. P. 6 ¶ 23].

The case was finally dismissed in January, 2013, after the District Attorney's office rejected the case for prosecution "due to the fact that the currency seized still contained U.S. mint/bank wrappings at the time of seizure and [Plaintiff Dutton] provided documentation on the recent sale of property in Van Zandt County in which [she] received $34,997.00 from the transaction of that sale." Most of her money was also finally returned in January, 2013. [App. P. 6, App. P. 27].

On or about January 9, 2013 Estelline City Administrator Ferguson called Plaintiff Dutton and told her that she could come pick up her money. Plaintiff Dutton was hesitant to return to Estelline given what had happened to her, without something in writing. City Administrator Ferguson e-mailed Plaintiff the letter from Luke Inman's office. Plaintiff's brother drove her to Estelline City Hall on January 10, 2013. They then followed Mr. Ferguson to the police department where the money was being kept in a locker. Plaintiff Dutton's speeding ticket was also dismissed that day. [App. P. 7 ¶ 29; App. P. 52, ln. 5-23; App. P. 86, ln. 3-7].

$29,640,00 was returned to Plaintiff Dutton. When she told City Administrator Ferguson that this was not all of the money, he told her that it was what they had. Plaintiff Dutton signed for it,

but made it clear that this was not the amount that Officer Fry told her he counted. [App. P. 7 ¶ 30; App. P. 87, ln 1-11].

In January, 2013, Plaintiff Dutton contacted Nelwyn Ward of the City of Memphis about obtaining information from the City of Memphis and Chief Jolly under a FOIA request.[9]  Plaintiff Dutton also spoke directly to Chief Jolly who simply informed her that he did not have to prepare his own report because he was assisting another agency on the stop.  Unfortunately, he never provided Plaintiff Dutton with the videotape of the stop, either.   Plaintiff Dutton also sent FOIA requests to the City of Estelline and Hall County, Texas.  While Plaintiff Dutton received Officer Fry's reports, no one ever provided her with the videotapes of what had occurred.  [App. pp. 7-8 ¶ 31].

It was extremely upsetting to Plaintiff Dutton to be arrested, have her money seized, and to be called a money launderer.  It is also upsetting to her that this arrest remains on her record even though charges were not pursued. [App. P. 8 ¶ 32].

---

[9]While Plaintiff's formal written request under the Freedom of Information Act to City of Memphis officials was apparently sent to the wrong e-mail address due to typographical error, such officials failed to maintain the videotape despite her verbal communications with Mr. Jolly and Ms. Ward in January, 2013.  Of course, the City of Estelline did nothing to preserve the videotape from her arrest or incidents videotaped at the Estelline City Hall despite the fact that they received written notice of her requests under the Freedom of Information Act. [App. pp. 7-8 ¶ 31, App. pp. 9-31.].  Defendant Officer Fry admits that when criminal charges or forfeiture proceedings take place, the department attempts to keep the tapes available. [App. P. 136, ln. 21-25].  He does not know why the videotapes responsive to Plaintiff Dutton's FOIA request were not available. [App. P. 137, ln. 1-4].  Chief Jolly adds that if an agency he helps wants a video or supplemental report from him, he provides same upon request. [App. P. 147, ln. 15-25].

17

E.      **Evidence that Defendants Reasons for the Search, Arrest & Seizure are Hotly Disputed**

1.      Overall

Defendant Officer Fry claims that Plaintiff Dutton was "nervous,[10] making furtive movements,[11] and giving evasive answers during a roadside interview."[12]   None of this is true. Plaintiff Dutton was no more nervous than any person being stopped by an officer; she made no furtive movements; and although she did not think she should have to explain what she had been doing, she fully answered questions about her trip to Amarillo and the source of her money.  [App. P. 6 ¶ 25].

Defendant Chief Jolly never saw Plaintiff Dutton make any furtive movements. [App. P. 154, ln. 4-8].  While he did see her act nervous, he would expect that from someone whose car was being searched by a drug dog. [App. P. 154, ln. 9 through p. 155, ln. 5].  Chief Jolly contends that Plaintiff Dutton was never belligerent or rude. [App. P. 161, ln. 16-25].  She basically just wanted to know "why me?" [App. P. 161, ln. 20-23].

_____

[10]Defendant Officer Fry incredibly claims that most people are not noticeably nervous when pulled over by a police officer. [App. P. 102, ln. 11-18].  Defendant Chief Jolly more candidly admits that a hundred percent of people are somewhat nervous when they get stopped. [App. P. 142, ln. 24 through p. 143, ln. 2].

[11]Defendant Officer Fry describes that the alleged "furtive movements" consisted of Plaintiff Dutton leaning towards the center console or passenger side of the vehicle and looking around to see what he was doing. [App. P. 113, ln. 19-25].

[12]Defendant Officer Fry took the fact that Plaintiff Dutton did not want to answer questions as being "evasive", despite the fact that she had the right not to answer such questions and despite the fact that she did actually answer such questions.  [App. P. 109, ln. 20 through p. 111, ln. 14].  It is Defendant Officer Fry's contention that Plaintiff Dutton's steadfast belief that she had done nothing wrong somehow made her less believable. [App. P. 116, ln. 1-12].

18

Defendant Officer Fry also claims that Plaintiff Dutton's vehicle and/or the money smelled of marijuana.  They did not.  [App. P. 6 ¶ 26].

In sum, Plaintiff Dutton was arrested, searched, and her money was seized, despite the fact that she is a law abiding citizen who had done nothing worse than speeding – simply because she chose to carry with her lawfully obtained money.  [App. P. 7 ¶ 27].

The individual defendant officers lacked sufficient cause to arrest Plaintiff Dutton, search her truck, and/or seize her money.  [App. P. 7 ¶ 28].

2.    The Alleged Smell of Marijuana

Although Defendant Officer Fry wrote in his report that: "There was a strong odor of an unknown origin coming from within the vehicle that I believed was marijuana," [*See* App. P. 17], he actually testified that he was <u>certain</u> that the odor he detected was marijuana. [App. P. 107, ln. 25 through p. 108, ln. 3].  This is true despite the fact that he was suffering from a sinus infection. [App. P. 107, ln. 18-24].  However, Defendant Officer Fry does not contend he smelled burnt marijuana; he contends that he smelled raw marijuana. [App. P. 109, ln. 1-7].  He describes the smell of raw marijuana as being different from burnt marijuana, close to the order of wet alfalfa hay. [App. P. 109, ln. 1-12].

Defendant Fry contends that this smell existed on Plaintiff Dutton's money as well as in her truck.  [App. P. 121, ln. 10-14].  Defendant Fry contends that the odor of patchouli, used as a perfume by Plaintiff Dutton, was not the odor that he smelled coming from the money, as it is not marijuana. [App. P. 121, ln. 15-22].  **In short, Defendant Fry contends that he is <u>positive</u> that the odor coming from Ms. Dutton's vehicle and the money in her vehicle was marijuana was not patchouli. [App. P. 126, ln. 8-23].**

19

As set out above, Plaintiff Dutton denies that her truck or any of its contents, including the money, smelled of marijuana.  Plaintiff's sister, Nancy Hutchins, confirms that while she has never known Plaintiff Dutton to smoke or possess marijuana, she has known Plaintiff Dutton's truck to smell like patchouli – but that smells nothing like marijuana. [App. P. 230 ¶ 6].  Plaintiff's friends Jacqueline Pipla and Michael Lammerding confirm the same thing. [App. pp. 232 & 233].  Mr. Lammerding, of course, had been in the truck that very day. [App. P. 232 ¶ 7].  He further confirms that at no time during their stay in Amarillo had Plaintiff Dutton possessed or used any drugs. [App. P. 232 ¶ 8].

Defendants rely on contrary identical Affidavits from Memphis State Bank tellers Vickie Knowles and Colleen Owens. [*See* App. pp. 241-244].  Of course, neither of these tellers were in the presence of the money seized from Plaintiff Dutton on the day it was seized but only after it had been in Defendant Officer Fry's possession overnight.  Therefore, they have no knowledge of whether the money had any odor prior to the time it was brought to them. [App. P. 224, ln. 23 through p. 225, ln. 1].  Furthermore, Teller Owens has only been around people smoking marijuana, not the raw marijuana that Defendant Officer Fry contends that he smelled and that he states has a different odor. [App. P. 226, ln. 14-24].  Even more telling, in direct contradiction to her affidavit, prepared by Defendants, [App. P. 222, ln. 11-18], Teller Knowles has never smelled marijuana [App. P. 221, ln. 19-21], and to her, the money in question **smelled only like old, used money**. [App. P. 222, ln. 8-12].

**Chief Jolly never smelled anything coming from Plaintiff Dutton's truck.** [App. P. 152, ln. 11-13].  **He never smelled anything coming from the money.** [App. P. 152, ln. 19 through p.

20

153, ln. 5]. **In fact, he has no personal knowledge of any odor of marijuana or anything else at the scene of Plaintiff Dutton's arrest.** [App. P. 153, ln. 6-10].

City Administrator Ferguson adds that despite being only a few feet outside of Plaintiff Dutton's vehicle, he never noticed any odor from it. [App. P. 198, ln. 17-19]. Similarly, despite placing the money in the filing cabinet at City Hall, he noticed no odor on the money seized from Plaintiff Dutton. [App. P. 199, ln. 17-24].

> 2.    The Drug Dog's Reliability

Defendant Officer Fry testifies that whether or not to call in a drug detection dog is left to the subjective discretion of City of Estelline officers. [App. P. 138, ln. 19 through App. P. 139, ln 3]. The November 28, 2012 incident was the first time that Defendant Officer Fry ever called for use of a drug dog in Estelline. [App. P. 100, ln. 11-14]. After stopping Plaintiff Dutton as 6:55 p.m., Defendant Officer Fry requested the canine at 7:08 p.m. Chief Jolly arrived at 7:26 p.m. At 8:14 p.m., Ms. Dutton's status is reflected as "one female in custody waiting on DA." She finally arrived at the jail at 9:18 p.m. [App. P. 127, ln. 17 through p. 131, ln. 11].

"Kilo," the dog, allegedly alerted on the driver's side of the vehicle by sitting down. [App. P. 118, ln. 20 through p. 1195, ln. 3; App. P. 148, ln. 25 through p. 149, ln. 9]. Kilo subsequently alerted to only the money that was located in the vehicle. [App. P. 120, ln. 1-4]. In fact, once the money was taken out, Kilo alerted to the bag and no longer alerted to the truck at all. [App. P. 150, ln. 1 through p. 151, ln. 6]. Of course, the officers are aware from their training and experience that the vast majority of money in circulation has drug residue. [App. P. 120, ln. 5-11; App. P. 151, ln. 7-11].

"Kilo" had never been used in a vehicle search before. This was his first live search. [App p. 149, ln. 20-22]. In fact, Chief Jolly only received their Certificate of Completion and Competency for a Patrol Narcotics Detection Dog Handler on November 21, 2012, exactly one week prior to Plaintiff Dutton's arrest. [App. P. 173, ln. 5-13].[13]   This was his first use officially. [App. P. 173, ln. 11-13]. He had no field performance record at all with the City of Memphis. [App. P. 174, ln. 16-20]. In fact, Defendant Chief Jolly kept only two days of training records, amounting to his first sixteen hours of training, before he ceased doing so for Kilo at the City of Memphis. [App. P. 174, ln. 25 through p. 175, ln. 21]. Even those first two days of training occurred on the two days following Plaintiff Dutton's arrest. [App. P. 175, ln. 22-24]. Chief Jolly acknowledges that while he has since assisted several agencies, it has been his mistake not to keep an accurate record of it. [App. P. 176, ln. 12-15].

**Chief Jolly considers Kilo's hit on Plaintiff Dutton's vehicle to be successful simply because money in circulation has narcotics on it, and his dog is trained to hit on narcotics.** [App. P. 176, ln. 20 through p. 177, ln. 9]. Of course, this reasoning would make a hit on anyone who was carrying money a "successful" hit. The first time that Kilo actually found dope occurred almost a month after Plaintiff Dutton's arrest. [App. P. 178, ln. 3 through p. 179, ln. 10]. Despite a stated intention to have Kilo certified by the National Narcotics Dog Association the following April after getting him, that has still never happened. [App. P. 181, ln. 18-25].

---

[13]In fact, Kilo was formally welcomed to Memphis by the Hall County Herald in its November 28, 2012 publication, the same day as Plaintiff Dutton's arrest. [App. P. 179, ln. 11 through p. 180, ln. 9].

3.    Defendant Officer Fry's Reports – App. pp. 17 & 18

Defendant Officer Fry is trained as an officer to make his reports as full and correct as possible. [App. P. 104, ln. 20-22]. He contended at deposition that everything contained in such report was correct. [App. P. 104, ln. 23 through p. 105, ln. 2]. He also contends that it included all of the important details. [App. P. 112, ln. 21-23].

Strangely, Defendant Officer Fry's report does not include the presence of City of Memphis Police Officer Deena Jolly who helped search the vehicle. [App. P. 117, ln. 13 through p. 118, ln. 19].

Further, Defendant Officer Fry charged Plaintiff Dutton with money laundering under Section 34.02 of the *Texas Penal Code*. [App. P. 122, ln. 1-6]. He states in his report that he concluded that the money was somehow the proceeds from a felony activity because:

> Based on conversation with Chris and Danny and what was being relayed from the DA's office, all of the research done on the side during the stop, trying to corroborate her stories that weren't being corroborated. In light of the whole picture I believe there was enough probable cause to arrest for the money laundering.

[App. P. 123, ln. 5-12]. In fact, Defendant Officer Fry describes the information obtained from the District Attorney's office to be only: "That it sounded like there's probable cause for a case." [App. P. 124, ln. 12 through p. 125, ln. 2].

Defendant Officer Fry went on to state in his report that "Chief Jolly and myself felt there was enough probable cause for a good faith arrest since there was no evidence that the money was legitimate, the story could not be cooberated [*sic*], and the money smelled of marijuana. [App. P. 125, ln. 20-24; App. P. 17]. He added in his second report: "I spoke with Chief Jolly of the Memphis Police Department to see if he had noticed the odor. He stated that he did not smell the money

personally, but there was a strong odor of marijuana coming from the vehicle when he was looking inside it." [App. P. 18].

**Contrary to Defendant Officer Fry's report, Defendant Chief Jolly did not smell marijuana, and he never told Defendant Officer Fry that he did.** [App. P. 153, ln. 18 through p. 154, ln. 3]. **Simply put, Defendant Chief Jolly never smelled any marijuana, either raw or smoked**. [App. P. 161, ln. 11-13].

Defendant Chief Jolly did contact Danny Dawson, the narcotics investigator for the 100th Judicial District Attorney's Office. [App. P. 162, ln. 4-13; p. 185, ln. 12-14]. He is a former narcotics investigator who holds his advanced certification from TCLEOSE. [App. P. 185, ln. 20-24; p. 186, ln. 6-7]. Chief Jolly has called him for assistance in the past.

After relaying what he had learned, **District Attorney investigator Dawson told Chief Jolly: "if this was my stop, I would not make the arrest."** [App. P. 162, ln. 14 through p.164, ln. 6]. **Chief Jolly passed this information along to Defendant Officer Fry.** [App. P. 164, ln. 7-9]. **Defendant Chief Jolly gave Defendant Officer Fry no advice beyond what Investigator Dawson said.** [App. P. 164, ln. 15-21]. Defendant Chief Jolly considers Investigator Dawson an expert on this type of call. [App. P. 167, ln. 18-22]. Certainly, Chief Jolly considered Investigator Dawson to be a reasonable officer. [App. P. 168, ln. 23-24].

Investigator Dawson confirms that he spoke to Chief Jolly twice. [App. P. 187, ln. 9-11]. In the first conversation, he told Defendant Chief Jolly to try and verify the property sale. [App. P. 187, ln. 12-14]. He also told him that based on the facts that he had, he would not make the arrest. [App. P. 187, ln. 19-22]. He added that while he believed that Plaintiff Dutton was probably dirty, he did not feel at the time that there was enough there to make a case. [App. P. 187, ln. 23-25]. Of course,

he added that he was not there and was not sure that he had all of the facts, but based on what he had been told **he would not have made the arrest.** [App. P. 188, ln. 1-5].

Approximately twenty minutes later, they spoke again. [App. P. 188, ln. 17-20]. By that time, he understood that there was additional information from a sister regarding the sale of the property. [App. P. 190, ln. 16-19]. Nevertheless, he was told that Defendant Officer Fry had made the arrest. [App. P. 188, ln. 21-24]. He responded that it was Defendant Officer Fry's decision to make and "at this point, you'll just have to see where it goes." [App. P. 188, ln. 25 through p. 189, ln. 6].

From the information that he had been given, Investigator Dawson did not believe that "several" of the elements of the crime had been met. [App. P. 191, ln. 11-25]. The biggest one was that he did not believe they had proved that the money was from illegal drug activity. [App. P. 192, ln. 1-4].

Contrary to Defendant Officer Fry's report, while Investigator Dawson attempted to call the District Attorney, he was not able to speak to him until after the arrest was made. [App. P. 193, ln. 13-18]. **At the very least, however, Investigator Dawson made it clear that if it were him, he would not have arrested Plaintiff Dutton.** [App. P. 194, ln. 6-10]. A fair reading of Defendant Officer Fry's report would lead a reasonable person to believe that Investigator Dawson was telling him the opposite.

Even Estelline Chief Administrator Ferguson would expect a reasonable officer to follow the District Attorney's office's recommendation regarding whether or not to make an arrest. [App. P. 216, ln. 11-14]. Nevertheless, that did not happen here.

## V

## Standard for Summary Judgment

Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to summary judgment as a matter of law.   Harper v. Harris County, 21 F.3d 597, 600 (5th Cir. 1994). The court must first consult the applicable substantive law to determine the material factual issues.  Id.  The court must view the evidence bearing on material factual issues in the light most favorable to the non-movant. Id.

Fed.R.Civ.P. 56© provides that summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  The party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for his motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which he believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.  Adickes v. S. H. Kress & Co., 398 U.S. 144, 158-59 (1970).

26

VI

### Defendant City of Estelline is Not Entitled to Summary Judgment
### on Plaintiff Dutton's Fourth Amendment Claims

**A.      Plaintiff's Unlawful Detention Claim**

1.      The Law

Assuming Defendant former Officer Fry had a legitimate reason to stop Plaintiff Dutton, *i.e.* speeding, any subsequent detention and activities must be reasonably related in scope to that legitimate reason.[14]  U.S. v. Shabazz, 993 F.2d at 435, recently relied on in U.S. v. Macias, 658 F.3d 509, 517-18 (5th Cir. 2011).  If a traffic stop is valid, the police are permitted to request and examine the driver's license and registration or rental papers, and conduct a computer check.  U.S. v. Brigham, 382 F.3d 500, 507 (5th Cir. 2004).  An officer may not extend the duration of the stop longer than necessary to deal with the reasons for the stop without violating the Fourth Amendment, unless additional reasonable suspicion of criminal activity supported by articulable facts, has emerged to justify prolonging the detention.  *Id.* at 507.

The suspicion required to justify continuing the initial detention after the time necessary to conduct any legitimate traffic enforcement need not rise to the level of probable cause, but must be based on more than an unparticularized suspicion or hunch.  U.S. v. Sokolow, 490 U.S. 1, 7 (1989).  The totality of circumstances, including the knowledge and experience of the officer involved, must be considered.  *U.S. v. Jones*, 234 F.3d at 234.  However, "[t]he Fourth Amendment requires some minimal level of objective justification."  U.S. v. Sokolow,  490 U.S. 1, 7 (1989).  Reasonable

---

[14]Plaintiff Dutton does not now, nor has she ever, contested her original stop for speeding.

27

suspicion requires more than just an officer's sense that a person has something to hide.  U.S. v. Cavitt, 550 F.3d 430, 437 (5th Cir. 2008).

Merely acting nervous, unbelievable answers to questions, and conflicting statements about the trip have been rejected as a valid basis for reasonable suspicion to prolong a detention.  Id., describing Santiago, 310 F.3d at 342.  In U.S. v. Dortch, the Fifth Circuit rejected the driver's nervousness, his lack of apparent authorization to be driving a rental car, inconsistent explanations about the driver's relationship to the renter, and inconsistent stories about whether the driver had been in Houston or Pensacola, as a basis for reasonable suspicion of drug trafficking to prolong a detention.  199 F.3d at 195-96, 199.

In U.S. v. Jones, the Fifth Circuit similarly rejected inconsistent answers about the occupant's place of employment and the driver's job duties, and the driver's prior arrest on a drug charge, as being sufficient to create reasonable suspicion to prolong a roadside detention.  234 F.3d at 241-42.  Those asserted bases for "reasonable suspicion are at best trivial."  Id.  In addition to such observations and behavior, reasonable suspicion requires more concrete evidence of an offense, such as evidence, that in light of an officer's experience and training, suggests a hidden compartment or other effort to conceal drugs.  Id., referring to U.S. v. Estrada, 459 F.3d 627, 632 (5th Cir. 2006).

2.    Application to Plaintiff Dutton

Defendant Officer Fry contends that he had reasonable suspicion to detain Plaintiff beyond the original purpose of the stop based upon furtive movements, nervousness, and an alleged smell of marijuana.  While these reasons might be sufficient to provide reasonable suspicion were they true, each is hotly contested by Plaintiff Dutton.

28

Plaintiff Dutton has at all times denied furtive movement and over-nervousness in this action. Her testimony is further bolstered by the testimony of Defendant Chief Jolly who never witnessed either furtive movements nor unusual nervousness by Plaintiff in his interaction with her under the.. circumstances.   Furthermore, even Defendants concede that nervousness and defensive answers alone would not likely provide sufficient basis to establish reasonable suspicion to justify continued investigatory detention.

As a result, Defendants rely mainly on the existence of the alleged odor of marijuana.  As set forth above, however, Plaintiff Dutton has produced substantial summary judgment evidence that no such odor or marijuana existed, and there was no way that Defendant Officer Fry could conclude that it did.  The Court is not required to accept Defendant Fry's self-serving, contradicted testimony on this matter.  *See e.g.*, Gardner v. Bd. of Police Commr's for Kansas City, Mo., 2012 WL 170969 at * 3 (W.D.Mo. Jan. 20, 2012).  As a result, the Court in Kingsland v. City of Miami, 382 F.3d 1220 (11th Cir. 2004) stated:

> ...we note that the plaintiff has proffered no less evidence regarding the presence or absence of a cannabis odor than the defendants have. The plaintiff's word is merely countered by the defendants' testimony.  Given the standard of review at the summary judgment stage, we must accept Kingsland's version of the facts as true.  *See* Rowe v. City of Fort Lauderdale, 279 F.3d 1271, 1279 n. 9 (11th Cir. 2002) (stating that a court must accept the non-movant's version of disputed facts as true for purposes of summary judgment).  Therefore, the district court improperly accepted as true the defendants' allegation that the truck smelled of cannabis, and erroneously used this fact to support summary judgment in the defendants' favor. Whether an odor of cannabis was indeed emanating from the truck is a genuine issue of material fact suitable for consideration by a jury.

382 F.3d at 1227.

29

That Defendant Officer Fry's claim of an odor of marijuana is not to be believed is further made clear by his additional claims in his reports that Chief Jolly had also smelled marijuana – which he had not; his obtaining affidavits from bank tellers about the smell of marijuana, despite the fact that one was not familiar with the smell of raw marijuana, and the other actually only believed that the money smelled like old, used money, and his misleading comments regarding conversations with Danny Dawson which would lead one to believe that the DA's office had <u>advised</u> the arrest of Ms. Dutton, though they clearly did not do so.

Defendant's arguments and Commander Rodriguez's conclusions regarding reasonable suspicion rely on the actual existence of an odor of marijuana for Defendant Officer Fry to have acted on.  Plaintiff Dutton has raised an issue of material fact as to whether any such odor existed. Based upon this summary judgment evidence, no reasonable officer could have believed that reasonable suspicion existed to detain Plaintiff Dutton.

**B.     Plaintiff's Unlawful Search Claim**

1.     <u>The Law</u>

The probable cause to *search* a vehicle requires the officer to have probable cause to believe that they will find an instrumentality or evidence of a crime.  <u>Dyke v. Taylor Implement Mfg. Co.</u>, 391 U.S. 216, 221 (1968).

Where, as here, such a search is based, at least in part, on the use of a narcotics detection dog, additional considerations exist.  While the Supreme Court has recognized that an alert by a drug detection dog with uncontested proof of reliability detecting drugs in controlled settings can establish probable cause, it also indicated that probable cause requires that all of the circumstances and facts surrounding a dog's alert would make a reasonably prudent person think a search would reveal

30

contraband or evidence of a crime.  <u>Florida v. Harris</u>, 133 S.Ct. 1050, 1057-58 (2013).  "Even if a dog is generally reliable, circumstances surrounding a particular alert may undermine a case for probable cause – if, say, the officer cued the dog (consciously or not), or if the team was working under unfamiliar circumstances. <u>Id</u>.  The Supreme Court clarified that a totality-of-the circumstances test must be applied, and there must be an opportunity to challenge a dog's reliability.  <u>Id</u>.

        Because most circulated currency includes residue of drugs, courts have given little, if any, weight to a drug dog's alert on currency.  <u>U.S. v. $506,231 in U.S. Currency</u>, 125 F.3d 442, 453 (7th Cir. 1997) (minimal probative value); <u>U.S. v. U.S. Currency $30,060.00</u>, 39 F.3d 1039, 1042 (9th Cir. 1994); <u>U.S. v. $10,700 in U.S. Currency</u>, 258 F.3d 215, 229-31 (3d Cir. 2001); <i>see also</i> <u>U.S. v. Daniels</u>, 2009 WL 1565873 at *5 (E.D.La. 2009); <u>U.S. v. $80,760 in U.S. Currency</u>, 781 F.Supp.462, 475-78 (N.D.Tex. 1991).

        2.      <u>Application to Plaintiff Dutton</u>

        Defendants again rely on the alleged odor of marijuana in order to support probable cause for searching Plaintiff Dutton's truck.  For the reasons set out above, the existence of any such odor is a disputed issue of material fact.

        Defendants, therefore, must rely on the alert allegedly made by narcotics detection dog, "Kilo" in order to claim probable cause existed to search Plaintiff Dutton's vehicle.  This, too, must fail.  Inexperienced drug dog "Kilo" had never been used in a vehicle search before.  This was his first live search.  In fact, it was his first official use at all.  He had no field performance record at all. Not surprisingly, "Kilo" simply alerted to currency, which all agree was likely to have drug residue on it.  "Kilo" first successfully found dope about a month later.  Based upon this summary judgment

31

evidence, no reasonable officer could have believed that probable cause existed to search Plaintiff Dutton's vehicle.

## C.      Plaintiff's Unlawful Arrest Claim

        1.      The Law

It was well-established law at all times relevant to this case that the Fourth Amendment probable cause requirement for a warrantless arrest is that the officers must, at the moment of the arrest, have within their knowledge reasonably trustworthy information sufficient to warrant a prudent man to believe that the person being arrested had, or was, committing an offense. Beck v. Ohio, 379 U.S. 89, 91 (1964). Whether a person is under arrest for Fourth Amendment purposes, as opposed to being temporarily detained, turns on whether a reasonable person in the position of the Plaintiff would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest. U.S. c. Corral-Franco, 848 F.2d 536, 540-41 (5th Cir. 1988). Being taken to a police station constitutes an arrest requiring probable cause to be consistent with the Fourth Amendment. Freeman v. Florida, 70 U.S. 811, 815 (1985).

        2.      Application to Plaintiff Dutton

Even if "Kilo's" hit could be deemed reliable, it does not provide probable cause for Plaintiff Dutton's arrest given the additional information at the time of the arrest that no drugs were present and that Plaintiff Dutton had obtained the money from a land sale in Van Zandt County, as confirmed by her sister.

Regardless, Defendants list twelve factors which they contend provided probable cause for Plaintiff Dutton's arrest. Six of them are alleged to be direct while six are considered indirect. In truth, the factors are largely redundant and in most cases, disputed.

32

First, Defendants contend that the officer on the scene smelled marijuana.  As set out above, this factor is hotly contested.

Second, Defendants contend that "Kilo" alerted to the odor of drugs on the vehicle.  Again, however, the inexperienced dog alerted only to the currency, as evidenced by the fact that he only alerted to the bag of money once it was taken out of the vehicle.  Even the handler, Defendant Chief Jolly considers this to be a successful hit only because <u>most</u> currency includes some drug residue.

Third, Defendants contend that Plaintiff Dutton was carrying a large amount of money in her purse, wrapped in envelopes and a plastic bag.  However, Plaintiff fully explained same, and it was verified by her sisters.

Fourth, Defendant Officer Fry claims that the money smelled like marijuana to him.  Again, it is hotly disputed whether this could possibly been the case, particularly given Defendant Officer Fry's explicit testimony that he is <u>certain</u> that he smelled <u>raw marijuana</u>.  No other support exists for this in the record other than Defendant Officer Fry's self serving testimony.

Fifth, Defendants contend that the drug dog alerted to the money.  Even Chief Jolly acknowledges that this was to be expected as most currency has drug residue.

Sixth, Defendants contend that the amount of cash is equivalent to a felony amount of marijuana.  Of course, Ms. Dutton explained and her sisters verified that the cash came from a land sale, not marijuana.

Seventh, Defendants contend that Plaintiff made furtive movements.  This allegation is a disputed issue of material fact.

Eighth, Defendants contend that Plaintiff seemed overly nervous and anxious.  This, too, is a disputed issue of material fact.

33

Ninth, Defendants contend that Plaintiff Dutton failed to follow instructions.  Of course, as Plaintiff Dutton was not under arrest but did have an allegation of marijuana made against her, she had every right to make her sister aware of where she was and try to hear what Defendant Officer Fry was saying.

Tenth, Defendants contend that Plaintiff allegedly acted evasive and overly defensive.  Of course, Plaintiff Dutton had every right to exercise her right not to consent to a search of her vehicle. Furthermore, she was simply adamant that she had done nothing wrong.  Defendant Chief Jolly more accurately describes her attitude as being: "Why me?"

Eleventh, Defendants contend that Plaintiff's explanation regarding her trip to Amarillo seemed suspect to the officers.  Defendant Fry's contention that Plaintiff's story was inconsistent is curious given that Plaintiff Dutton was in fact collaborating on music with a gentleman from Hawaii. Of course, the other alleged indicia that she was overly nervous remains hotly disputed.

Twelfth, Defendants contend that Officer Jolly was unable to corroborate Ms. Dutton's story regarding the real estate transaction.  This is, of course, untrue.  Both of Plaintiff's sisters confirmed that the property transaction had taken place within the last month or so, and Ms. Hutchins confirmed that it would have yielded somewhere around $40,000.0.

This recitation of factors ignores the fact that Defendant Officer Fry was advised on the scene that Investigator Dawson advised that he would not make the arrest, yet Defendant Officer Fry's reports appear to misrepresent both this advice <u>and</u> the fact that Defendant Chief Jolly at no time smelled any marijuana.

Defendants rely on <u>Granado v. State of Texas</u>, 2006 WL 2466972 (Tex.App.–Amarillo, Aug. 25, 2006) for the proposition that sufficient cause existed for Plaintiff Dutton's arrest and even

34

conviction.  In that case, however, the jury also had evidence of extraneous offenses for possession

of drug paraphernalia and methamphetamine residue having been found in the individual's vehicle.

This case, instead, is more like <u>Deschenes v. State of Texas</u>, 253 S.W.3d 374 (Tex.App.–Amarillo,

2008) in which the Court, faced with 22 similar alleged factors, found:

> The State did not present any credible evidence from which it could
> be inferred Appellant was involved in any drug transaction, sale, or
> delivery at or around the time he was arrested for money laundering.
> The State produced no evidence of drugs being found.  Nor did the
> State present any evidence of previous involvement in drugs or drug-
> related activities by Appellant.  Appellant has no prior convictions or
> police contact related to drugs, has no known relationship with drug
> trafficking, and made no admissions related to the source of the
> money other than to say he earned it.  Furthermore, the money was
> not packaged in any way to indicate a conscious desire to prevent its
> detection by drug dogs.  Here we have no admissions, no drugs, no
> prior connection to drugs, and no obvious attempt to surreptitiously
> secrete the money or prevent its discovery.  Simply put, we have no
> credible evidence of a temporal connection, or nexus, between the
> money and some criminal activity.

253 S.W.3d at 385-86; *see also* <u>King v. State of Texas</u>, 254 S.W.3d 579 (Tex.App.–Amarillo, 2008).

**D.**     **Plaintiff's Unlawful Seizure of Money Claim**

1.     <u>The Law</u>

The Fourth Amendment also requires probable cause to believe that a thing is contraband

before it can be reasonably seized as forfeitable contraband.  <u>Florida v. White</u>, 526 U.S. 559, 564-65

(1999).  To be considered contraband under *Tex.Code Crim.Pro.* Ch. 59, money must be a "proceed"

from one of a prescribed felony list of criminal offenses.  *Id.* at Art. 59.01(2)©; *see also* <u>$9050 in</u>

<u>U.S. Currency v. State</u>, 874 S.W.2d 158, 161 (Tex.App.-Houston 1994).

35

2.    Application to Plaintiff Dutton

For the same reasons that Plaintiff Dutton's arrest was not supported by probable cause, the seizure of her money was also not supported by probable cause. Furthermore, $1,400.00 of such proceeds were never returned to Plaintiff Dutton given that she was told that Defendant Officer Fry counted $31,000.00 at her car, yet only $29,600 was returned.

**E.    Defendant City of Estelline's Municipal Liability**

1.    Law Regarding Municipal Liability

It is well-established that municipalities are liable under 42 U.S.C. §1983 for constitutional torts that are in compliance with the municipality's customs, practices, policies or procedures. Monell v. New York Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In fact, a municipality is liable for constitutional deprivations visited pursuant to governmental custom even though such custom has not received formal approval through the body's official decisionmaking channels. Monell, 436 U.S. at 690-91, 98 S.Ct. at 2035-36, 56 L.Ed.2d at 635.

The Fifth Circuit defines a custom or policy as (1) a policy, statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or (2) a persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted or promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. Bennett v. City of Slidell, 735 F.2d 861, 862 (5th Cir. 1984) (*en banc*), *cert. denied*, 472 U.S. 1016 (1985). In short, municipal liability may be imposed when "(1) the

36

enforcement of a policy or custom was (2) the moving force of the violation of federally protected rights." Doe v. Dallas Independent School District, 153 F.3d 211, 216 (5th Cir. 1998).

It is not even necessary that the municipality through its chief law enforcement officer, have actual knowledge of a line officer's propensity for misconduct, so long as the municipality should have had knowledge. Brandon v. Holt, 469 U.S. 464, 467 (1985). Inherently deficient administrative procedures involving the discovery of police misconduct are sufficient to trigger liability. Brandon, 269 U.S. at 467, n. 6. For example, investigatory practices may show a policy of deliberate indifference to the rights of citizens where oral complaints are not logged. See Vineyard v. Murray County, 990 F.2d 1207, 1212 (11th Cir.), cert. denied, 510 U.S. 1024 (1993).

Furthermore, a constitutional policy may still be unconstitutionally applied in which case the municipality is liable if it did not adequately train the officer, and the constitutional wrong is caused by the failure to train. Canton v. Harris, 489 U.S. 378, 387 (1989). Likewise, a municipality's failure to supervise triggers liability for the constitutional torts committed by the individual officer. Kersh v. Derozier, 851 F.2d 1509, 1513 n. 6 (5th Cir. 1988); Lozano v. Smith, 718 F.2d 756, 768-71 (5th Cir. 1983); Douthit v. Jones, 641 F.2d 345, 346 (5th Cir. 1981); McClelland v. Facteau, 610 F.2d 693, 697 (10th Cir. 1979). Inadequacy of supervision of municipal employees may establish municipal liability under Section 1983 "where the inaction is indicative of an official policy or custom that manifests deliberate indifference towards the rights of the injured persons. Doe v. Rains County ISD, 66 F.3d 1402, 1409 (5th Cir. 1995).

In those areas where an individual alone is the final authority or ultimate repository of the municipality's power, the municipality is liable for the individual's wrongful acts and decisions

37

because they represent official policy.  <u>Turner v. Upton County, Texas</u>, 915 F.2d 133 (5th Cir. 1990); <u>Familias Unidas v. Briscoe</u>, 619 F.2d 391, 404 (5th Cir. 1980).

        2.      <u>Application to the City of Estelline</u>

The summary judgment evidence in this case demonstrates that the City of Estelline's predominant policy with regard to its one person police force is for him to go out and make some money, supplying the necessary revenue to support the city's budget and, in fact, pay his own salary. There is <u>no</u> day to day supervision over the officer.  What the officer does to raise the money in question is left to his subjective discretion.  There are no written policies regarding arrest, search, seizure, or use of a drug dog.  No records of verbal complaints are kept, even though there have been "dozens and dozens" of them.  In short, Defendant Officer Fry was given leeway to do whatever he felt necessary to raise money for the City of Estelline, even where it meant, as in this case, that he was disregarding the advice of the District Attorney Investigator and including false information in his subsequent reports.  Even so, he was never subjected to any discipline, or even investigation, by the City of Estelline.   Defendant Officer Fry simply followed the persistent, widespread practices of the City of Estelline in violating Plaintiff Dutton's rights.

<b>VII</b>

<b><u>Defendant City of Estelline's Motion for Summary Judgment on Plaintiff Dutton's<br>State Law Claims Should be Denied as Moot</u></b>

Defendant City of Estelline has additionally moved for summary judgment on Plaintiff Dutton's state law claims.  This motion should be denied as moot for the reason that Plaintiff Dutton does not now nor has she ever brought any state law claims in this action.

38

## VIII

## Miscellaneous Issues Regarding Plaintiff's Damages

**A.      Plaintiff is Entitled to Seek Recovery of her Money Which was Not Returned**

Plaintiff Dutton has set forth summary judgment evidence that Defendant Officer Fry told her that he counted $31,000.00 at the time of her arrest.  This corresponds with the approximate amount that Plaintiff Dutton believed she had at the time of her arrest.  After the arrest, Defendant Officer Fry kept the money in his quarters, rather than the evidence locker, and it was the next day before such money was taken either to City Hall or the bank.  The jury is not required to accept Defendant Officer Fry's self serving testimony that there was actually only $29,600.00 in her funds, notwithstanding that Plaintiff Dutton was told something to the contrary.

**B.      Plaintiff is Entitled to Seek her Bond Fees**

Defendant attempts to preclude Plaintiff Dutton from recovering her bond fees for the reason that same was actually paid by a friend.  However, it is clear that Plaintiff Dutton continues to view such fee as a debt which she intends to repay for her friend who paid it.  Of course, such debt would not have arisen but for Plaintiff Dutton's unlawful arrest.

**C.      Plaintiff Does Not Seek Punitive Damages Against the City of Estelline**

Plaintiff Dutton does not seek punitive damages against the City of Estelline, as punitive damages are not recoverable against a municipality.

**D.      Declaratory and Injunctive Relief is Unnecessary**

Plaintiff Dutton does, however, agree that declaratory and injunctive relief in this cause of action is unnecessary.

39

## X

### Conclusion

For the reasons set forth above, Defendant City of Estelline's motion for summary judgment should be in all things denied.

Respectfully Submitted,

/s/ *Alex A. Castetter*
Alex A. Castetter
Attorney for Plaintiff Dutton
Bar Card No. 00783808

Stuckey, Garrigan & Castetter Law Offices
2803 C North Street
P.O. Box 631902
Nacogdoches, Texas 75963-1902
(936) 560-6020 / Fax: 560-9578
Alex@sgclaw.org

### CERTIFICATE OF SERVICE

_____I hereby certify that I have served all counsel of record in this case including the following with a true and correct copy of the foregoing Plaintiff's Brief in Support of Response in Opposition to Defendant City of Estelline's Motion for Summary Judgment by sending same electronically to:

Lee Ann Reno
Alex Yarbrough
Sprouse Shrader Smith, P.C.
701 S. Taylor, Suite 500
P.O. Box 15008
Amarillo, TX 79105-5008

on this the 27th day of May, 2014.

/s/ *Alex A. Castetter*
Alex A. Castetter

40
