IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TEXAS

AMARILLO DIVISION

| | | |
|---|---|---|
| LAURA DUTTON, an Individual, | § | |
| | § | |
| PLAINTIFF, | § | |
| vs. | § | CIVIL ACTION CAUSE NUMBER |
| | § | |
| JASON FRY, former City of Estelline Police | § | 2:13-CV-180-J |
| Officer, in his Individual and Official Capacit- | § | |
| ies, *et al.,* | § | |
| DEFENDANTS. | § | |

### ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

This is a civil rights case arising out of a traffic stop, arrest and seizure of cash which occurred in the City of Estelline, Texas. Defendants move for summary judgement on all of Plaintiff's remaining claims. For the following reasons, Defendants' motions are granted as to one claim against one Defendant, and otherwise denied.

### The Parties Agreed and Stipulated Facts

The following facts are stipulated to be true: Laura Dutton is a 64 year old woman who has never been convicted of a crime. In October, 2012, Ms. Dutton was a party to the sale of 12.9 acres of land in Van Zandt County, Texas. Her share of the proceeds was $34,997.00.

In later November, 2012, Ms. Dutton traveled to Amarillo, Texas to meet up with a friend she had met on the internet, Michael Lammerding. They stayed at the Holiday Inn Express in Amarillo. On November 28, 2012, Ms. Dutton dropped off Mr. Lammerding at the Amarillo Airport, then began driving back to her home in Azle, Texas, close to Ft. Worth.

At approximately 6:55 p.m., she was stopped by City of Estelline, Texas Police Officer Jayson Fry, for speeding, *i.e.* going 61 mph in a 50 mph zone. After talking briefly with Ms. Dutton and

bringing the citation for speeding to her, Officer Fry asked Ms. Dutton if she minded if he searched her vehicle. She said "yes." Officer Fry then requested a drug dog to the scene, which arrived in the form of City of Memphis Police Chief Chris Jolly and his dog, "Kilo."

After Chief Jolly walked "Kilo" around Ms. Dutton's vehicle, it was searched. Over $29,000.00 was found in Ms. Dutton's truck. No drugs were found. After further conversation, Laura Dutton was arrested on charges of money laundering. She was held overnight at the Hall County Jail. She was released the next day on bond.

The money laundering charge against Ms. Dutton was dismissed in January, 2013, after the District Attorney's office rejected the case for prosecution "due to the fact that the currency seized still contained U.S. mint/bank wrappings at the time of seizure and [Ms. Dutton] provided documentation on the recent sale of property in Van Zandt County in which [she] received $34,997.00 from the transaction of that sale." $29,600 was returned to Ms. Dutton on January 10, 2013. Her speeding ticket was also dismissed that day.

Jayson Fry was a certified peace officer and met all the requirements for being a certified peace officer on November 28, 2012. Chris Jolly was also a certified peace officer and met all the requirements for being a certified peace officer on November 28, 2012.

Chris Jolly's canine, "Kilo" received his Certificate of Completion and Competency for a Patrol Narcotics Detection Dog Handler through Worldwide Canine, Inc. in San Antonio, Texas on November 21, 2012. Worldwide Canine, Inc. is operated by Commissioned Texas Peace Officers and Certified Trainers/Instructors and registered with the Texas Department of Public Safety, State Board of Private Investigators and Private Security Agencies, the Drug Enforcement Administration, and the ATF.

Ms. Dutton brings her claims for violation of her Fourth Amendment rights under 42 U.S.C. § 1983. Officer Jayson Fry and Chief Chris Jolly were acting under color of law at all times on the occasion in question.

## Background Facts /[1]

On the evening of November 28, 2012, Plaintiff Dutton was driving on U.S. Highway 287 south from Amarillo through the City of Estelline, Texas. Defendant Fry stopped Dutton for speeding. Plaintiff admits that she was probably speeding, because she failed to slow down fast enough at the point the speed limit dropped to 50. Officer Fry was parked a short distance away from and just past the 50 m.p.h. limit sign.

On the date of the November 28th incident, Officer Fry was a relatively new Estelline police officer, having been hired by the City on or about October 26, 2012. Since becoming a conditional reserve officer with the City of Tahoka police department in March of 1999, Estelline was the twentieth (20th) law enforcement agency at which Fry had been employed full and/or part time in the preceding thirteen (13) years. Fry ceased his employment with Estelline about one month later, during December of 2012. Fry ceased working as a law enforcement officer in November of 2013, just shy of one year after this incident.

Fry was Estelline's only police officer. Fry he testified in his deposition that he was the person responsible for maintaining the customs and practices of the Estelline police department. He testified that all of his actions during the incident in question were done in compliance with and pursuant to the policies, procedures, practices and customs of the City of Estelline. The written "standard operation procedures" of the Estelline police department comprise a total of 17 points, listed on a single page

---

[1] This factual summary is based upon the evidence filed of record, and the exhibits that are stipulated to be both authentic and admissible at trial in this case.

of paper.  Point Number One is highway traffic speed limit enforcement and control – that is, "patrol duties to slow traffic in and thru the city limits and other authorized areas."  The Estelline City Manager, Richard Ferguson, testified in his deposition that there were no other general or specific City police policies in writing; that is, there were no written arrest policies, no written search policies, no written drug dog policy, and no written forfeiture policies.  There are no written City records of past searches or seizures made.  Ferguson testified that pursuant to official City policy, practice and custom, whether or not to arrest, search, call for a drug dog, or seize property was left to the "sound discretion of the individual police officer."

This event occurred late in November of 2012.  Analysis of the 2011 and 2012 Estelline city budgets show that traffic fines and forfeitures comprised approximately 89.9% of the City's 2012 gross revenue.  Property taxes accounted for 1.67% % of the 2012 city revenues, and sales taxes raised 5.71% of total 2012 city revenues.  Fines and forfeiture were up from 2011.  In 2011, traffic fines and forfeitures comprised approximately 83.4% of city revenue.  The City has been able to increase its traffic ticket income a little bit every year, according to its Mayor *pro tem*.

However, the City owed the State of Texas $600,000 for the State's share of traffic ticket income, which the City had failed to remit to the State during 2006 and 2007.  As of March 18, 2014, the City had reduced that back amount owing to approximately $300,000.  The City was paying $10,000 per month on that debt as of March, 2014.

During the stop, Dutton refused Fry's request to search her car.  Fry then called for a drug dog, allegedly because he smelled raw marijuana (not burnt) and he thought Dutton was acting suspiciously nervous.  Plaintiff denied to Fry that there was any marijuana in her car or on her person, and denies in her deposition that she acted more nervous than anyone normally would under the circumstances.  She denied that she acted suspicious in any manner, but testified that she was very concerned when

4

Fry told her he smelled marijuana.  She alleges that she told Fry that she did not smoke or drink, had no drugs, did not "do drugs," and had not "done any drugs."  She testified in her deposition she was concerned because she thought at the time she was caught up in a "rogue" police operation, since she knew that there was no way Fry could really be smelling any marijuana.  Fry testified in his deposition that he had a sinus infection during the stop, there were other odors present inside the vehicle, so he decided he would "rather err on the side of caution and go ahead and call the canine out."

It took about thirty additional minutes for Defendant Jolly, then the police chief of the City of Memphis, Texas, to arrive on the scene with his new drug dog.  This was the first time Chief Jolly had used his dog, Kilo, which he had obtained just one week earlier.  This was the first time during his employment at Estelline that Fry had called for a drug dog search.  The dog and its handler at this time were not certified pursuant to any national or regional certification organization and, as of Defendant Jolly's February 20, 2014 deposition, the dog and its handler still had not completed any additional certification programs or re-certification training programs since they had left Worldwide Canine on November 21, 2012.

Dutton alleges that she was intentionally removed from the area of her car so that she could not observe what the dog and Jolly were actually doing.  Jolly testified that the dog alerted for the presence, or possibly the former presence, of an unspecified drug in "close proximately" to Dutton's purse.  It is stipulated that no drugs of any type were found in or around the auto, on Dutton's person, or within her purse or belongings.  However, inside her purse the officers did discover approximately $31,000 in cash.  The money was in mostly $100 bills still tightly wrapped in original "Vault Number 20, First National Bank, Canton, Texas" bank wrappers, inside two white bank cashier's envelopes. Once the officers found the money, further searching stopped.

After the positive hit inside the vehicle, the contents of the vehicle were searched individually, after being removed to the side of the roadway. The dog was taken around the truck again, and did not alert. The dog did not alert to any of the other contents of the vehicle, or to Dutton's clothing or luggage. While the deposition testimony in the record is not crystal clear, it appears that the dog did, however, alert a second time to the money itself – perhaps while it was inside Dutton's purse (or perhaps, as Chief Jolly put it, in "the bag") on the side of the road. It seems clear that the dog was alerting only to the odor of drugs on the money itself, or to drug odor on the money inside the "bag" or purse in which money was found.

Defendants Jolly and Fry testified in their depositions that they both knew that anywhere from "some," "a lot," or maybe "the vast majority" of the cash in circulation today has either drug residue or the odor of drugs on it.   They knew that drug residue on "used" or non-Mint cash did not alone provide sufficient probable cause to arrest a person or seize her cash. They knew at the time of the arrest that it was not illegal to travel with cash, even large sums of cash, in your possession.

Defendant Fry, with the aid of Defendant Jolly, arrested Dutton for money laundering. Fry testified that he personally made the decision to arrest Dutton. Plaintiff Dutton testified that Jolly told her that if it were up to him, Jolly would not have arrested her but that it was Fry's decision. In his deposition, Jolly did not deny that he made that statement to Dutton, but he did not admit he told Dutton that. However, Jolly admitted that he had instructed Fry to "detain" Dutton when his new dog "hit" on the smell of drug residue on her cash. Specifically, Jolly said "Hit, detain her," whereupon Fry handcuffed Dutton with her hands behind her back and placed her inside his patrol car. She was certainly not free to leave at that point.

Later, Fry put Plaintiff inside Jolly's squad car, because it was equipped with a video camera and audio recording equipment. Plaintiff was then further interrogated inside Jolly's car by both Jolly

and Fry.  Defendant Jolly asked Dutton where she got the money.  Dutton truthfully told Jolly that the cash was the result of a recent real estate transaction, the October, 2012, sale of property in Van Zandt county.  That fact was confirmed to the officers by a phone call they received from Dutton's two sisters, made during the road-side interrogation.  One sister told Jolly she believed the real property sale was closed within the past month or so, maybe two or three months ago, and the other told Jolly she thought Dutton had received about $40,000 from the sale.  Jolly spoke to both sisters; Fry did not speak to either sister.  Fry asked Dutton on the video why she had refused consent to search.  Dutton replied because she had done nothing wrong.

Jolly was concerned enough about what he had learned from the interrogation of Dutton and his conversations with her two sisters that called the District Attorney's investigator, Danny Dawson, about whether to arrest or not.  Jolly testified that he had not personally smelled any marijuana odor from either the vehicle, Dutton, her purse, or the money.  In two separate conversations with Dawson, whom Jolly considered to be his available expert on searches, seizures and arrests, Jolly was told by Dawson there was not enough evidence to justify an arrest.  Jolly told Fry that Dawson had advised that no arrest be make, but Jolly also testified that he told Fry that it was Fry's decision to make because it was his stop.  Jolly did testify that his employer, the City of Memphis, would receive a percentage of forfeiture money where Memphis officers, such as himself, assisted in the search and arrest.  After consultation with Chief Jolly, Fry decided to make the arrest on money laundering charges.

With the assistance of an Chief Jolly's wife, Memphis police officer Deena Jolly, Fry counted the money on the hood of Jolly's squad car.  Dutton testified in her deposition that Fry later informed Dutton that the amount he and Deena Jolly had counted was $31,000, and that Fry told her he would turn that amount of money over to the District Attorney.  Dutton testified that she believed that

$31,000 was approximately how much money she actually had in the bank envelopes at the time, based upon what she knew she had left home with ($31,500) and what she had spent since then.

Dutton was transported by Fry to the Hall County jail, incarcerated overnight, and taken to an appearance before a local justice of the peace the next day. Bond was set by the justice of the peace at $10,000.00. Plaintiff was able to bond out that day at her expense. She was not given any portion of her seized money back at that time. She was never given a written receipt for any of the seized money. Neither the Estelline Police Department or the Hall County jail records record the exact amount of money, if any, she was credited with possessing either at the time of her arrest or upon her arrival at the county jail.

Fry took the seized money and gave it to the City of Estelline's city manager, Richard Ferguson. It was never turned over to the District Attorney's office. Ferguson testified in his deposition that he did not personally smell any marijuana odor on the money at any time. Later, Fry took the money to the Memphis State Bank to be counted again. Interestingly, two bank tellers in affidavits prepared by defense counsel stated the money smelled of marijuana at that time. However, in their depositions both affiants testified differently from what is stated in their signed, notarized affidavits. Bank teller Knowles testified that to her knowledge she had never smell marijuana, and did not think she knew what it smelled like. Teller Owens testified that she had smelled only burning marijuana being smoked at high school parties some years past, and had never known and did not know what raw marijuana smelled like. Defendant Fry testified in his deposition that the money distinctly smelled like raw marijuana, but not burnt marijuana.

The criminal case against Dutton ended in January, 2013, after the District Attorney's office rejected the case for prosecution. The day of her release from county jail, Plaintiff had provided to both the City of Estelline and to the District Attorney's office documentation of the land sale and of

the amount of sale proceeds she received on or about October 18, 2012, from that sale. The District Attorney's office had earlier informed Dutton they had no record of her money laundering arrest, but they did get Dutton's sales documentation. The City Manager for Estelline said the city gave its set of the sales documents to the District Attorney's office.

The District Attorney's office has stated they never received a copy of Dutton's recorded police interrogation. The City of Memphis claims they destroyed their copy of that recorded interrogation. The City of Estelline says they didn't make any such video or audio recording of Dutton's road-side interrogations; only Memphis did. The City has a video recording system covering the police location where Dutton's money was locked up overnight, and the location at city hall where Fry turned over Dutton's money to Ferguson and received it again to take it to the bank. However, Estelline claims that no video recordings exist from either of those recording devices.

Eventually Estelline informed Plaintiff that she had to come back to the city to get her money. Plaintiff and her brother traveled to the Estelline city manager's office to get her money. $29,640 – most, but allegedly not all – of Plaintiff Dutton's approximately $31,000 in seized cash was returned by the City of Estelline in January, 2013. When the city manager told her he was giving her back $29,640, Dutton informed the official that was less than the amount of money Fry actually seized, and asked the city manager where the rest of her money was. Plaintiff was told that's all the money the City had to give her. Dutton complained about the shortage, signed a receipt for that amount, but hand wrote on the bottom of that receipt her contention that she had more than the $29,640 seized, and left town.

Plaintiff was not reimbursed by any of the Defendants for the $1,050 in bonding fees and expenses which Plaintiff Dutton testified she was obligated to pay to bond out of jail the day after her arrest. She was not reimbursed for her travel expenses back to pick up her seized funds. She has never

received the balance of her seized money, or an oral or written explanation for the discrepancy.  Her speeding ticket was dismissed.

### Plaintiff's Claims

Plaintiff Dutton alleges that the defendant officers wholly lacked sufficient cause to arrest her, any probable cause at all to search her car, any legitimate reason to seize her money, or any legitimate reason to fail or refuse to return all of her seized cash to her.  She alleges that she did not smell of marijuana, or act overly nervous, furtive, or suspicious in any manner.  She alleges in essence that Defendants Fry and Jolly are not telling the whole truth about what actually happened that night, that all of the acts and omissions of the individual defendant police officers were done in conscious disregard of and with deliberate indifference to Plaintiff's constitutional rights, and that all of the acts and omissions of the individual defendant police officers were intentional, malicious, consciously indifferent to her rights, and/or committed in reckless disregard to her rights.

Plaintiff alleges that Defendant Fry's wrongful acts and omissions in arresting and searching Plaintiff Dutton, as well as seizing her money were in compliance with the actual policies, procedures, practices and customs of Defendant City of Estelline, Texas.  Specifically, Plaintiff contends that the "City of Estelline empowered Defendant Officer Fry with unfettered discretion to arrest, search and seize the money of citizens without any reason, other than the need for the city to finance its operations through its well-known speed trap."  She alleges that Estelline's deficient policies, procedures, practices and customs as they relate to the arrest, search and seizure of money – in essence, an official city policy of "go out there and get me some money"– as well as the City's inadequate policies, lack of supervision and absence of training on constitutionally lawful arrests, searches and/or seizures, were a producing and proximate cause of the violation of Plaintiff's constitutional rights.  She alleges that,

based on information and belief, the City of Estelline has, at least, "tolerated" its police officer's "misconduct with actual or constructive knowledge of same."

All unconstitutional acts were allegedly committed under color of law. Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiff seeks compensatory damages and punitive damages, and attorneys' fees and costs. All of the Defendants are alleged to be jointly and severably liable, and both individual police officers are sued in their individual and official capacities.

### Summary Judgment Standards

The Court may terminate litigation by rendering a summary judgement where no genuine issue of material fact exists and the moving party is entitled to judgement as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)(initial burden is on movant to show entitlement to summary judgment with competent evidence). A material fact issue is one that might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The substantive law governing the case will identify which facts are material. *Id.,* 477 U.S. at 249, 106 S.Ct. at 2510. The party opposing judgment must point the Court to "specific facts with sufficient particularity to meet all the elements necessary to lay a foundation for recovery, including those necessary to negate the defense" offered by movant. *Brown v. Texas A&M University,* 804 F.2d 327, 333 (5th Cir. 1986)./[2]

Summary judgement disposition is inappropriate if the evidence before the Court, viewed as a whole, could lead to different factual findings and conclusions. This Court must resolve "all factual uncertainties and mak[e] all reasonable inferences in favor of the nonmoving party." *Bienkowski v.*

---

[2]       *Accord Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Celotex Corp.,* 477 U.S. at 323-25, 106 S.Ct. at 2553; *Liberty Lobby, Inc.,* 477 U.S. at 247-48, 106 S.Ct. at 2510. The nonmoving party must designate specific facts showing there exists a genuine issue of material fact on those elements sought to be negated by the movant. *Ibid.*

*American Airlines*, 851 F.2d 1503, 1504 (5th Cir. 1988).  If a rational trier of fact based upon the

record as a whole could not find for the non-moving party, there is no genuine issue for trial.  *Amoco*

*Prod. Co. v. Horwell Energy, Inc.*, 969 F.2d 146, 147-48 (5th Cir. 1992).  Such a finding may be

supported by the absence of evidence necessary to establish an essential element of the non-moving

party's case.  *Celotex Corp. v. Cartrett*, 477 U.S. 317, 322, 106 S.Ct. 82, 121 L.Ed.2d 265 (1986).

"Finally, where the non-moving party has presented evidence to support the essential elements

of its claims but that evidence is merely colorable, or is not significantly probative, summary

judgement may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249-50, 106 S.Ct. at 2510-

11 (citations omitted).  Legal conclusions and general allegations do not satisfy this burden.  *Id.,* 477

U.S. at 250, 106 S.Ct. at 2511; *Lechuga v. Southern Pacific Transp. Co.,* 949 F.2d 790, 798 (5th Cir.

1992)(conclusory statements in affidavits do not provide facts that will counter summary judgment

evidence, and testimony based on conjecture alone is insufficient to raise an issue to defeat summary

judgment); *Galindo v. Precision Am. Corp.,* 754 F.2d 1212, 1216 (5th Cir. 1985)(party affidavits

setting forth only ultimate or conclusory facts are insufficient to either support or defeat a motion for

summary judgment).

### *Qualified Immunity Standards*

Qualified immunity shields government officials from civil damages liability "insofar as their

conduct does not violate clearly established statutory or constitutional rights of which a reasonable

person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396

(1982).  More precisely, "[t]he contours of the right must be sufficiently clear that a reasonable official

would understand that what he is doing violates that right ... in the light of pre-existing law the

unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97

L.Ed.2d 523 (1987).  As the Fifth Circuit has held, "pre-existing law must dictate, that is, truly compel

(not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances." *See Pierce v. Smith*, 117 F.3d 866, 882 (5th Cir. 1997)(internal quotation and citation omitted).

The Court should view the facts in favor of the plaintiffs. *See Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151 (2001)("Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?  This must be the initial inquiry."); *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991).  Qualified immunity provides "ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant,* 502 U.S. 224, 229, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991)(citation and internal quotation omitted).

Until 2009, courts resolved government officials' qualified immunity claims under the two-part test mandated by the Supreme Court in *Saucier v. Katz*, deciding:  (1) first whether facts alleged or shown by plaintiff make out the violation of a constitutional right, and (2) if so, whether that right was clearly established at the time of the defendant's alleged misconduct. *See Saucier*, 533 U.S. at 201 (2001); *Sorenson v. Ferrie*, 134 F.3d 325, 328 (5th Cir. 1998).  The Supreme Court revisited that rule in 2009, determining that the rigid two-step structure was no longer mandatory. *Pasco ex rel. Pasco v. Knoblauch*, 566 F.3d 572 (5th Cir. 2009)(citing *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009)).

Accordingly, as the Court did in *Pearson*, the court may first consider whether the officer's conduct violated clearly established law. *Pearson, supra,*. 555 U.S. at 234-44, 129 S.Ct. at 822 (2009). If the answer is no, then qualified immunity shields defendants from suit.  There is no contention in this lawsuit that the law was unclear at the time of Dutton's stop, seizure, or arrest.

13

## Discussion and Analysis

Before November 28, 2012, Plaintiff's right were clearly established to be free from unreasonable search, seizure and arrest, as well as her right to have all of her seized money returned when criminal charges were refused by the District Attorney. *See Tennessee v. Garner,* 471 U.S. 1, 4, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985); *Terry v. Ohio,* 391 U.S. 1, 8-9 (1968).  Since these rights were clearly established by the time of the incident in question, the Court will address whether the acts as alleged by Plaintiff, and the summary judgment evidence tendered by the Plaintiff, are sufficient to show the alleged violations of constitutional rights.  Summary judgement is inappropriate if the evidence, viewed as a whole, could lead to different factual findings and conclusions.  The Court must resolve all factual uncertainties and make all reasonable inferences in favor of the Plaintiff.  Given the evidence in this record, the Court concludes that there exists sufficient competent summary judgment evidence from which a jury could find in Plaintiff's favor on her claims.

Plaintiff alleges that she was arrested and jailed in an effort to unlawfully seize her substantial amount of money pursuant to a calculated city policy to fund the city through unlawful seizures of cash via the city's "speed trap."  The city manager testified in his deposition that it was the sentiment of the "vast majority" of the Estelline City Council members that but for the City's zealous enforcement of its speed limit reduction zone they could not afford to "fix up the town, take down old buildings, [or] mow," and would become like other towns that have "just gone away."  The City Manager testified that without the traffic fines and seizures the City would not have "any substantial income," and would not be able to properly maintain the town or afford a City staff other than "perhaps one person."  Consequently, the City's written police procedures state that speed enforcement was Fry's number one duty.  There is no evidence that the City of Estelline provided any training to Defendant Fry on constitutionally permissible searches and seizures, training on proper drug canine search procedures,

14

on what does and does not constitute probable cause to arrest, or on any city policies other than the City's one-page "standard operations procedures" for which Fry had signed an acknowledgment of receipt on the date he started work with the City as their police force.

Plaintiff testified that she truthfully told the officers the source of the money, and that Jolly contemporaneously verified her answers – both at to the amount of the sale proceeds and the recent time frame of that sale – through one or more telephone conversations with two of her sister.  She alleges that City Manager Ferguson, Defendant Fry and non-party Deena Jolly (Chief Jolly's wife) were the only persons who handled the cash on the night of the arrest or the next day and, since officer Deena Jolly is not a party, it is not alleged that she took any of the cash.

Defendant Jolly testified that he never personally touched any of Dutton's cash.  Defendants Fry and Estelline's explanation for the discrepancy in the amount Plaintiff Dutton says she was carrying versus the amount returned to her by Richard Ferguson is, in a nutshell, that she just was not carrying as much as she thinks she was.  Plaintiff disputes that, and testified that she knew exactly how much money she left home with ($31,500), how much cash she spent on the trip (not more than a couple hundred dollars), and how much she was returning home with (very close to $31,000).  Dutton testified that her estimate of $31,000 was confirmed by Fry's statements to Dutton that he would be depositing that amount into a DA's account and thereby turning over a total of $31,000 to the District Attorney's office.

Ferguson  testified that as City Manager he would expect a reasonable officer to follow the District Attorney's office's recommendations regarding whether or not to make an arrest, but that Defendant Fry was not disciplined in any way for Dutton's arrest, or for the seizure of the money, or regarding her claim that approximately $1,400 in cash was seized that was not returned to her by

Ferguson himself. Apparently no official or unofficial City of Estelline investigation was conducted on Dutton's January, 2013, written complaint that more money was seized than was returned.

The November 28 and 29, 2012, police video recordings of Fry locking up Dutton's money overnight inside his residence quarters were apparently not saved by the City. The city hall video recordings of Fry turning the money over to Ferguson on November 29, 2012, and Ferguson later that day returning that money over to Fry to take to a bank, were also apparently not saved by the City. The City of Estelline and/or Fry did not, according to Chief Jolly, ever request a copy of Jolly and Fry's interrogations of Dutton inside Jolly's police car.

There is sufficient competent summary judgment evidence in the record of this case to create and support a genuine issue of material fact on the unlawful seizure claim. Further supporting Plaintiff's claims is relevant evidence which is missing from this record, lost under circumstances which might be sufficient to warrant a spoliation jury instruction in Plaintiff's favor. Presumably, those recordings might reveal relevant evidence supporting each of the parties' differing versions of the sequences of critical events, their differing recollections of who said what to whom, when, and, equally important, what the dog alerted to and precisely how the search was conducted, the money counted, and how much cash was seized. That evidence was at all times in the custody and control of the City of Estelline and Defendants Fry and/or Jolly. Presumably that relevant, discoverable and material audio and video evidence might be favorable to the Plaintiff, or to the Defendants' differing descriptions of relevant events.

It is stipulated that Plaintiff did not have any marijuana on her or in her automobile. She alleges that because of health issues she did not and had not smoked any marijuana, and had nothing in her vehicle which even could have smelled of marijuana. Jolly sat next to Plaintiff in his police car, and testified that he never smelled any marijuana on her, in her vehicle, or on the money. Defendants'

allegation that the drug dog could had made a legitimate "hit" for illegal drugs is disputed. Plaintiff argues that a legitimate alert was impossible because there were no drugs anywhere in or near the vehicle, her purse, any bag or in her possessions. It reasonably appears from Officer Jolly's deposition testimony that his new dog hit upon the odor of drugs upon Dutton's money, and not any illegal drug itself. That fact was clarified by the second canine search of the items placed upon the side of the road, when the dog literally sat upon either Dutton's purse or the bag containing the money, or perhaps upon the money itself. Why the money was not completely separated from Plaintiff's purse, or as Jolly explained it, from "the bag" – before that second canine search– so that the officers could confirm the dog was alerting to either the drug odor on the money alone, or not, is unclear.

Plaintiff testified in her deposition that it is not true that she was overly or suspiciously nervous, was making "furtive" movements, or giving any evasive answers during the roadside interrogations. She clearly testified that there is no way that her vehicle, her clothes, or her money could possibly smell of marijuana, and suggests that Fry was alerting to her perfume or some other fragrance inside her automobile. She correctly argues that it is not illegal to travel with large sums of cash. There is sufficient evidence in this record for a jury to return a verdict in Plaintiff's favor on her unconstitutionally prolonged detention/wrongful arrest/wrongful seizure claim.

Defendants are asking the Court to enter judgment in their favor because Plaintiff has no valid claim for unlawfully prolonged detention, search, arrest, confiscation of money, and failure to return all of the money she was carrying, despite the fact that the stipulated evidence is that she was only speeding, and was not carrying drugs, despite the evidence that she was not laundering money, but was perhaps unwisely carrying a fairly large sum of bank-wrapped non-Mint money (that is, "used" bills) inside her purse that probably or almost certainly had drug residue on it. Defendants' rely on disputed facts for entry of summary judgment upon all of the Plaintiff's claims, ignoring her contrary evidence

17

and all of the facts testified to: 1) by the Plaintiff, 2) by a former Estelline police officer that he was told by a City Council member that his real job was to go out there and make the City some money, and was to be supervised by Chief Jolly in doing so, 3) by Plaintiff's two sisters as to the true source, relevant date, and the sales proceeds amount material to the legitimate source of all of the seized funds, 4) after the arrest, by the two bank tellers regarding a lack of raw marijuana smell on the money, 5) by the Estelline city manager that he never smelled marijuana on the cash at any time, 6) by Chief Jolly that he never smelled marijuana at any time, anywhere, on the cash, the vehicle, on Dutton, the bag, or her purse, and that he personally would not have made the arrest on money laundering charges, 7) by DA Investigator Dawson that, based upon his 19 years of experience, there was insufficient evidence at the time to make any arrest, and that he told Jolly that opinion, 8) by other deponents regarding evidence in Plaintiff's favor, and 9) by Plaintiff's expert's opinion that no reasonable officer would have made that arrest upon those facts. Defendants' arguments are not sufficient to show their entitlement of summary judgment.

Plaintiff Dutton has brought forth competent summary judgment evidence that there was no smell of marijuana from her or her vehicle or her purse or her belongings. She has brought forth competent summary judgment evidence that the odor of drugs was only on the Canton Bank's envelopes, a "bag" or purse, and/or on the money itself. An odor on used currency and its container, alone, does not rise to probable cause to either arrest her or seize the money, and both Officers Jolly and Fry testified that they knew that at the time.

Plaintiff has brought forth competent summary judgment evidence reflecting that she did not act suspiciously nervous, or more nervous than was warranted under the circumstances, was not engaged in suspicious or criminal activity, did not make furtive movements or give evasive answers. If she reasonably thought that she was caught up in some small town "rogue" police operation designed

to seize her cash under false felony charges, a jury could agree that she could be nervous but not suspiciously so.

She has brought forth competent summary judgment evidence that, viewed in her favor, shows there was no way a valid drug "hit" could have been legitamently made on her car or purse or luggage for any form of illegal drugs. These facts are borne out by the stipulated and undisputed fact that no drugs were ever found, and by the fact that it can be reasonably concluded from Jolly's testimony that what the dog most likely hit upon was really just the money itself, which does not rise to the level of probable cause to either arrest Dutton or to seize her money as drug laundering proceeds.

Notwithstanding Defendants' speculation that perhaps drugs *could have been* in her car sometime within 72 hours of the stop, and the dog *could have* legitamently alerted to that, because all of Plaintiff Dutton's evidence is to be construed in her favor,  Defendants' motions are denied as to all claims– *except for* Plaintiff's allegation that Defendant Jolly is partly or jointly responsible for all of the seized funds not being returned to her by the City of Estelline.  There is no evidence that Jolly ever touched that money, counted it, or had anything to do with the overnight storage of the cash, its being given to Ferguson, being taken to Memphis State Bank, or its eventual return (or lack thereof) to Dutton.  Other than taking a so-called "trophy photo" of Fry and Kilo with all the money fanned out in front of them, there is no evidence Jolly did anything with any of the seized cash.

Finally, Plaintiff points out several false statements of fact in Defendant Fry's official police report arising out of the arrest. For reasons explained at length above, the falsehood allegedly include Fry's statement that "no person" contacted by him and Jolly were able to verify Dutton's "story on how the money was obtained," and that Jolly agreed "there was enough probable cause for a good faith arrest since there was no evidence that the money was legitimate, the story could not be cooberated [sic], and the money smelled of marijuana." It has long been clearly established under federal law that

19

there is no immunity available to a peace officer who falsifies a police report with the intention that criminal charges be brought against another, or for the purpose of protecting the officer from civil liability, or to otherwise wrongfully procure a criminal prosecution or conviction. *See Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959)(knowingly false witness testimony induced and given by state's agent violates a defendant's constitutional rights)./[3]

On the other hand, if the allegedly false statements in Fry's official police report from the night of the arrest are truthful, then a factual discrepancy exists between what Jolly testified he said and believed during his deposition, and what Fry wrote were Jolly's statements, beliefs, decisions and actions at the time of the arrest. In either event, there exists a genuine issue of material fact regarding whether Jolly did more than order Fry to detain and handcuff Dutton when his new drug dog first alerted during their search of Dutton's automobile. There is evidence from which a jury could find that Jolly unconstitutionally ordered Dutton's initial arrest based solely upon Kilo's positive alert on drug odors on the money itself. No reasonable officer would have arrested a suspect solely because his drug dog, certified or not, hit upon drug odors or drug residue on circulated cash. Based upon competent summary judgment evidence construed in a light most favorable to the Plaintiff, there was no legitimate grounds for Jolly to order the continued detention, in handcuffs in the patrol car, kept there while Chief Jolly, Deena Jolly, and Fry continued their search of her automobile, especially *after*

---

[3]     *Cf. Brown v. Miller*, 519 F.3d 231, 237 (5th Cir. 2008) ("A criminal defendant's due process rights are violated when the government obtains a conviction with testimony that government agents know is false. ... We therefore hold that the deliberate or knowing creation of a misleading and ... inaccurate ... report amounts to a violation of a defendant's ... rights, and that a reasonable [person] ... would have understood that those actions violated those rights."); *Limone v. Condon*, 372 F.3d 39, 44-45 (1st Cir. 2004)("if any concept is fundamental to our American system of justice, it is that those charged with upholding the law are prohibited from deliberately fabricating evidence . . .."); *Keko v. Hingle*, 318 F.3d 639, 644 (5th Cir. 2003)(government agents are not entitled to absolute immunity from §1983 civil rights lawsuits for pre-testimonial investigative activities); *Geter v. Fortenberry*, 849 F.2d 1550, 1559 (5th Cir. 1988)( a police officer cannot avail himself of a qualified immunity defense if he falsifies a police report by unlawful means).

Jolly conducted the second canine search of her property on the side of the road, spread out on the ground outside her vehicle, and Kilo alerted only to the tainted cash itself, and *after* Dawson had personally advised Jolly, and Fry through Jolly, not to make the arrest because in Dawson's opinion there was insufficient evidence to make their case. But instead of releasing Dawson when they confirmed the essence of Dutton's story (the fact of a recent property sale, and generally when and how much she had obtained), and/or upon realized Kilo was alerting only to the drug odor on cash itself, Fry's report states they both agreed there was sufficient evidence and grounds for a "good faith arrest." That raises a genuine issue of material fact about the true extent of Chief Jolly's involvement in the final decision to arrest Dutton of money laundering charges.

### Conclusions

Defendants Fry and Jolly assert an entitlement to qualified immunity on all claims asserted against them in their individual capacities. Genuine issues of material fact exist which preclude granting summary judgment to Officers Fry and Jolly on the Plaintiffs' unlawful seizure and arrest claim, and unlawful seizure of money claims.

However, there is no evidence that Officer Jolly had anything to do with the cash after it was seized, other than having his canine twice alert to the drug odor upon it. Therefore, to the extent that Plaintiff asserts an unlawful seizure claim against Jolly for the missing $1,400, Chief Jolly has shown his entitlement to judgment in his favor on the claims of the City of Estelline's failure to return all of her seized funds or, in the alternative, Officer Fry's failure to properly turn over all of her seized cash to proper City or District Attorney authorities, and/or the City of Estelline's liability for failure to have, train and/or supervise its police force in constitutionally proper search and seizure procedures.

Otherwise, Defendants' motions for summary judgment are denied.

21

The Court notes for the record that Plaintiff in her summary judgment response states that she does not, and has never, asserted any state-law based claims. Defendants' motions are therefore denied as moot as to their arguments for summary judgment on any such state-law based claims.

It is SO ORDERED.

Signed this the _____19d_____ day of June, 2014.


**MARY LOU ROBINSON**
UNITED STATES DISTRICT JUDGE

22